NAKAMOTO, J.
**484 Defendant was convicted on 16 counts of aggravated murder in 1989. This court affirmed 15 of those convictions in State v. Langley , 314 Or. 247, 839 P.2d 692 (1992), adh'd to on recons , 318 Or. 28, 861 P.2d 1012 (1993) ( Langley I ), but vacated defendant's death sentence and remanded his case for a new penalty-phase trial. See id . (so stating). The court has since done so twice more, first in State v. Langley , 331 Or. 430, 16 P.3d 489 (2000) ( Langley II ), and, most recently, in State v. Langley , 351 Or. 652, 273 P.3d 901 (2012) ( Langley III ). This automatic and direct review proceeding arises as the result of the death sentence imposed on defendant in 2014 following his fourth penalty-phase trial.
On review, defendant raises 77 assignments of error, only 12 of which warrant discussion here. Those 12 issues encompass four broad contentions: (1) the penalty-phase trial court judge was, or appeared to be, biased and should not have presided over the proceeding; (2) the court erroneously admitted evidence not specific to defendant regarding the second capital sentencing question set out at ORS 163.150(1)(b)(B) (whether there is a probability that defendant would commit criminal acts of violence constituting a "continuing threat to society"); (3) the court failed to expressly preclude jury consideration of aggravation evidence regarding the fourth capital sentencing question set out at ORS 163.150(1)(b)(D) (whether defendant *694 "should receive a death sentence"); and (4) the court erroneously applied sentencing-only remand provisions in capital cases arising before the United States Supreme Court's decision in Penry v. Lynaugh , 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). For the reasons that follow, we affirm defendant's sentence of death.
I. FACTUAL AND PROCEDURAL BACKGROUND
This matter comes before the court following the fourth jury determination that defendant should be sentenced to death for the 1987 aggravated murder of Anne Gray. At the time of Gray's death, defendant-while serving a term of incarceration for crimes not at issue here-lived in a cottage on the grounds of the Oregon State Hospital in **485 Salem, where he voluntarily participated in a low-security Correctional Treatment Program for mentally and emotionally disturbed inmates. The program was designed to help inmates nearing the end of their prison terms-like defendant-to transition back into the community through extensive psychological counseling, training in job and independent living skills, and general assistance in establishing productive post-prison lives.
Gray-a neighbor of defendant's girlfriend-disappeared on December 10, 1987. The same day, defendant enlisted his girlfriend's help in transporting a large, awkward bundle wrapped in a comforter from Gray's apartment to the home of defendant's aunt. In April 1988, Gray's decomposed body was found buried in a shallow grave located in the aunt's backyard. The discovery of Gray's body was facilitated in large part by the discovery a day earlier of defendant's second victim, Larry Rockenbrant, one of defendant's acquaintances.[1] Gray had died from asphyxiation, her body tightly tied into a fetal position by multiple bindings around her wrists, ankles, torso, and legs; her head was duct-taped to cover her mouth and nose, and a shoestring-type ligature was knotted tightly around her neck.
In December 1989, a jury found defendant guilty of aggravated murder in the death of Gray and sentenced defendant to die. In 1992, this court affirmed 15 of defendant's 16 aggravated murder convictions, but it vacated his **486 death sentence on the ground that the trial court had failed to give a proper jury instruction on the consideration and use of mitigating evidence. Langley I , 314 Or. 247, 839 P.2d 692.
A second penalty-phase proceeding followed, and defendant was again sentenced to death for Gray's murder. In 2000, this court vacated that death sentence on direct review, concluding that the trial court had erred by (1) refusing to allow defendant to waive any ex post facto objection to retroactively considering a true-life sentencing option in his case and (2) refusing to instruct the jury on that sentencing option. Langley II , 331 Or. 430, 16 P.3d 489.
On remand for a third penalty-phase proceeding, defendant was once again sentenced to death-after going through seven different defense attorneys and being ordered to proceed as a pro se litigant. On direct review in 2012, this court concluded that the trial court had erred by not securing a valid waiver of defendant's right to counsel, and defendant's case was remanded for yet another penalty-phase proceeding. Langley III , 351 Or. 652, 273 P.3d 901.
*695 In May 2014, after considering for a fourth time whether defendant should be executed for the murder of Gray, a jury again sentenced defendant to death for that crime. Our opinion now focuses on four different aspects of that 2014 proceeding.
II. ASSIGNMENTS OF ERROR REGARDING JUDICIAL BIAS AND RECUSAL
We begin with defendant's contention that the assigned trial court judge should not have presided over his latest penalty-phase trial. On direct appeal, defendant has tendered more than 20 assignments of error that assert the penalty-phase trial judge was, or appeared to be, biased and that defendant's motions for her removal or recusal were erroneously denied. Of those assignments of error, we address the following four:
"Presiding Judge Rhoades erred in failing to 're-set' [defendant's] ORS 14.260 challenges upon this Court's vacating [defendant's] death sentence and remanding to the Circuit Court for resentencing[.]" (Assignment of Error No. 12.)
**487 "Presiding Judge Rhoades erred by denying [defendant's] Motion to Disqualify Judge James pursuant to ORS 14.250 - 14.270 [.]" (Assignment of Error No. 7.)
"Presiding Judge Rhoades erred by denying [defendant's] Motion for Cause or to Recuse Judge James pursuant to ORS 14.210 [.]" (Assignment of Error No. 8.)
"Presiding Judge Rhoades erred in failing to grant [defendant's] Motion No. 39, in which [defendant] raised additional facts and information related to Judge James' conflict, bias and/or appearance of bias due to Judge James' former employment with the ODOJ and relative to the Gray , Rockenbrant and Langley- related matters[.]" (Assignment of Error No. 13.)
A. Procedural Background
On April 6, 2012, Judge Jamese Rhoades, Presiding Judge of the Marion County Circuit Court, filed a circuit court form titled Criminal Assignment Notice as part of the run-up to defendant's latest penalty phase proceeding. In that document, Judge Rhoades assigned Judge Mary Mertens James to preside over defendant's remanded sentencing trial. Before assuming their positions on the bench, both judges had worked as government lawyers: Judge Rhoades as an attorney in the Marion County District Attorney's Office and Judge James as an assistant attorney general in the Oregon Department of Justice's (DOJ) general counsel and trial divisions.
Defendant's newly appointed defense counsel apparently learned of that assignment on Monday, April 23, 2012, and, on Friday, April 27, 2012, filed two motions seeking Judge James's removal from the case. The first, captioned as "Motion for Change of Judge," cited as its authority ORS 14.250 to 14.270. In a nutshell, under certain conditions, those statutes prohibit a circuit court judge from hearing a matter when a party or attorney timely files a motion that establishes that the "party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge. In such case the presiding judge for the judicial district shall forthwith transfer the cause, matter or proceeding to another judge of the court[.]" ORS 14.250(1).
**488 The second of defendant's removal-related motions was based on the fact that Judge James had been employed by the DOJ during the period that the DOJ had represented the state while defendant appealed his convictions and sentences. In that motion, captioned as a "Motion to Disqualify Judge for Cause or to Recuse Judge," defendant relied primarily on ORS 14.210, which, among other things, prohibits a judge from presiding over a matter if the judge "has been attorney in the action, suit or proceeding for any party." ORS 14.210(1)(d). However, an important caveat attached to the prohibition set out in ORS 14.210(1)(d). Notwithstanding the particular circumstances articulated in that statute, disqualification would be deemed waived unless the motion for disqualification had been made "as provided by statute or court rule." ORS 14.210(2).
Defendant's motions were heard by Presiding Judge Rhoades; defendant raised no objections to Judge Rhoades's participation in that proceeding based on her prior employment with the county prosecutor's office.
*696 In May 2012, Rhoades denied both the "Motion for Change of Judge" and the "Motion to Disqualify Judge for Cause," indicating that the first was "[u]ntimely & successive," while writing with regard to the second, "Untimely. Successive. Authorities not on point." Judge Rhoades's ruling that the new filings were successive was based on the fact that defendant previously had relied on ORS 14.250 through 14.270 to secure the removal of Marion County judges Leggert and Barber during his 2004 sentencing proceedings.
Two months later, at the first status conference on the record, Judge James invited further discussion concerning defendant's motions for her removal. At that time, Judge James acknowledged that she and Judge Rhoades had, at some point as part of the case assignment process, discussed whether she, Judge James, could impartially preside over defendant's case. Judge James then discussed her previous employment history with the DOJ, its lack of intersection with defendant's previous appeals, and why it would be inappropriate for her to recuse herself:
"I was an employee of the Oregon Department of Justice from October of 1983 to March of 1984, I believe-I mean **489 of '94, and my assignments *** started out in general business and I then transferred to the civil trial division. I then became attorney in charge of labor and employment where I advised state agencies in labor and employment matters and represented agencies in administrative hearings and interest arbitration, that sort of thing. I did not have any contact with any of the divisions or units of the Department of Justice that may have been involved in any of the litigation involving Mr. Langley, had absolutely no contact with any of that[.]"
Judge James, therefore, declined to recuse herself.
In March 2014-nearly two years later and shortly before the commencement of defendant's new penalty-phase trial-defense counsel filed Motion No. 39, essentially a second request to disqualify Judge James that sought reconsideration of the previous disqualification denials. In the course of arguing that motion before Presiding Judge Rhoades, defense counsel acknowledged that the aim of the new motion was essentially the same as its predecessors, albeit more articulately stated and supported. Among other things, defendant argued for the first time that Judge James was required to recuse herself pursuant to the Oregon Code of Judicial Conduct. Defendant relied on former Judicial Rule (JR) 2-106(A)(2) (2012),[2] which provided, in relevant part, that judges must disqualify themselves when they have
"served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously was associated served during the association as a lawyer in the matter[.]"
Defense counsel also added several elements to his previous statutory argument for change of judge based on ORS 14.260. He argued that (1) the prohibition set out at ORS 14.260(5) against more than two applications for a change of judge had been "reset" with the advent of the new sentencing proceeding and (2) his original motion should be deemed timely because he had filed it at the first opportunity that he could, i.e ., the day that he was appointed to represent defendant.
**490 Presiding Judge Rhoades, however, denied the motion. She issued an order that read, in part:
"Regarding disqualification for cause, Judge Rhoades denies the motion, finding that Judge James did not have any association with and was not involved in any division or units or with any attorneys who were involved in this case while she was employed as an assistant attorney general at the Oregon Department of Justice.
"Regarding Defendant's motion for change of judge, Judge Rhoades denies the motion and finds that ORS 14.250 - .270 does not re-set at a new sentencing phase under ORS 163.150. Judge Rhoades also finds that the available challenges were applied to Judge Leggert and Judge Barber in 2004 and, thus, have been exhausted. Furthermore, the motion for change of judge was untimely, because Defendant filed his first motion, under ORS 14.250 - *697 .270, on April 24, 2012, while the time to file had expired on or about April 7, 2012, within 24 hours of the appointment of Judge James to this case."
On May 20, 2014, as the new penalty-phase proceeding neared its end, defendant submitted yet another set of reconsideration motions seeking Judge James's removal, as well as transfer of the entire case to a judge appointed from outside the Marion County Circuit Court. Defendant also asked that his motion be sent to the Oregon Supreme Court for assignment of a conflict-free judge to hear it. In his motions, defendant again argued that Judge James should be removed because, during the time when she had worked for the DOJ in its trial and employment divisions, the DOJ had been extensively involved in litigating appellate matters related to defendant without a formal screening mechanism to separate Judge James from those matters. Defendant maintained that the absence of such screening now created an appearance of partiality. Defendant cited three specific instances of Judge James's past work as a DOJ lawyer or current activity as a judge that, in his view, established actual bias or conflict of interest: her representation of the state in an employment case brought by a state employee, Weinstein, whom the state later called as a witness in defendant's trial; her appearance in a case on behalf of the MacLaren School for Boys; and her association with **491 a charity dedicated to supporting and honoring State Police personnel and their families.
Defendant's motion was assigned to out-of-county Senior Judge Gregory Foote and scheduled to be heard later on the same day that it had been submitted. Defense counsel, however, requested a set-over of that hearing, arguing that, because his co-counsel had drafted the motion in question, defense counsel was unprepared. Judge Foote granted defendant's request and reset the matter to be heard the following day. Although the hearing on that motion had now been set over to May 22, 2014, defendant's penalty-phase trial had not been similarly postponed, and, on May 21, 2014, the parties presented closing arguments and the matter was submitted to the jury. The jury reached its verdict later that afternoon, concluding that defendant should be sentenced to death. The next day, Judge Foote heard the parties' arguments and denied defendant's recusal-related motion for reconsideration.
B. Change of Judge under ORS 14.250 through 14.270
We first address the assignments of error-numbers 7 and 12-related to defendant's unsuccessful motion for a change of judge under ORS 14.250 through 14.270. Under ORS 14.260(1), a change of judge can take place in any proceeding, based on a motion and affidavit setting out a good-faith belief that the party cannot receive a fair and impartial hearing before the judge in question; no specific ground for the movant's belief need be alleged. The statutes also contain several important restrictions. First, parties are prohibited from submitting "more than two applications in any cause, matter or proceeding under this section." ORS 14.260(6) ; ORS 14.270. Second, a motion to change judge under ORS 14.250 through 14.270 must be made at the time of the trial court judge's assignment to the case. ORS 14.270.[3] Oral **492 notice of intent to file such a motion will suffice, provided that the actual "motion and affidavit are filed not later than the close of the next judicial day." Id .
On review, defendant first contends that Judge Rhoades erred in ruling that, under those provisions, defendant's ability to change judges in the proceedings below had already been statutorily exhausted. Defendant argues that, pursuant to the principle announced by the Court of Appeals in *698 Allen v. Premo , 251 Or. App. 682, 284 P.3d 1199 (2012), his ability to seek a change of judge should be deemed to have been reset following remand of his previous death sentence for a new penalty-phase trial. Second, defendant contends that his motion for a change should have been granted because his counsel's initial motion-although untimely-was nevertheless submitted as soon as was practicable, given that Judge James's assignment took place before legal representation had been appointed for defendant.[4]
For purposes of this opinion, we may assume, without deciding, that defendant could seek a change of judge anew on remand, despite having utilized the change of judge procedure before the remand. Even so, the terms of the statute and our precedent lead us to conclude that the trial court correctly denied defendant's motion as untimely filed under ORS 14.270.
By its terms, ORS 14.270 currently provides a strict timeframe in which to move for a change of judge:
"An affidavit and motion for change of judge to hear the motions and demurrers or to try the case shall be made at the time of the assignment of the case to a judge for trial or for hearing upon a motion or demurrer. Oral notice of the intention to file the motion and affidavit shall be sufficient compliance with this section providing that the motion and **493 affidavit are filed not later than the close of the next judicial day."
(Emphasis added.)
An examination of the statutory framework within which the current time limitation in ORS 14.270 was put into place reveals that the legislature repeatedly has limited the ability of litigants to request a change of judge. See Stevens v. Czerniak , 336 Or. 392, 401, 84 P.3d 140 (2004) (in determining legislative intent of a statute, this court considers statute's context, which includes, among other things, the statutory framework within which the law was enacted). When ORS 14.270 was originally made part of the Oregon Revised Statutes in 1955, the statutory time limit set by the legislature for filing the same motion to disqualify was nearly unlimited, in that it could be filed virtually any time before commencement of a hearing or trial:
"In any county of the State of Oregon where there is a presiding judge who hears motions and demurrers and assigns cases to the other departments of the circuit court for trial, the affidavit and motion for change of judges to hear the motions and demurrers or to try the case may be made at any time, either before or after the assignment of the case for trial, and either before a hearing upon a motion or demurrer or before the commencement of trial of the said cause [.]"
Former ORS 14.270 (1955) (emphasis added). But in 1959, the legislature significantly shortened that timeframe by nullifying a defendant's ability to disqualify a judge if the judge had already ruled on any substantive request or demurrer in the case, other than a motion for extension of time. See Or. Laws 1959, ch. 667, § 2 (so stating). Ten years later, the legislature further shortened the applicable timeframe by adding to ORS 14.270 the text that currently requires motions to disqualify a judge to be made "at the time of the assignment of the case." See Or. Laws 1969, ch. 144, § 1 (amending statute as noted).
Those amendments to the statutory scheme do not run afoul of a party's rights to take action under the statutes. That is so, this court has noted, because the provisions of ORS 14.250 to 14.270 reflect an extension of "legislative **494 grace" to litigants under which it is unnecessary for the parties to demonstrate that some source of law-such as a state or federal constitution-requires removal of a judge. State v. Pena , 345 Or. 198, 203, 191 P.3d 659 (2008). Regardless of an assigned judge's actual fairness or impartiality, those statutes allow a party-under limited circumstances-to remove the judge from a matter when either the party or the *699 party's lawyer believes that the judge cannot provide a fair and impartial trial. Id . As this court observed in Pena , by doing so, the legislature
"provided parties and lawyers an opportunity, one that is not constitutionally or otherwise required, to remove a judge for personal, but not necessarily legal, reasons. We think it follows that it does not matter whether a party's lawyer was present at the time of the assignment, or even if a party was represented by counsel . In either case, the motion to remove a judge, or at least oral notice of intent to file such a motion, 'shall be made at the time of the assignment.' "
Id . at 207-08. Thus, in this case, although defendant had no appointed lawyer at the time that Judge James was assigned to preside over the penalty-phase retrial, defendant was required to file a motion for a change of judge no later than April 7, 2012, the day after Judge James was assigned.
This court acknowledged in Pena that the results of its holding may appear harsh. But, at the same time, the court concluded that such an outcome is required by the plain text of the ORS 14.270 :
"We are aware that our reading of the statute as making individual parties, whose legal counsel is absent (or nonexistent), responsible for giving a statutory notice or suffering the loss of an important statutory right seems harsh. However, the words of the statute compel that reading. It may be that the legislature assumed that counsel would be present at the pivotal moment, but the words of the statute do not contain that assumption explicitly, and do not require that counsel be present."
345 Or. at 208 n. 3, 191 P.3d 659. Until the legislature alters ORS 14.270, a motion for change of judge under ORS 14.250 through 14.270 must be made at the time of the assignment , which did not occur below. The trial court correctly denied defendant's belated motion.
**495 C. Disqualification for Cause under ORS 14.210 and Code of Judicial Conduct
In addition to arguing that it was error not to change the trial judge under ORS 14.250 through 14.270, defendant also argues that his motions to disqualify Judge James for cause were erroneously denied below. Broadly speaking, defendant contends that, in addition to the fact that Judge James was previously employed as a DOJ attorney during the same period as the Gray and Rockenbrant murder prosecutions, the following factors militate for the general proposition that Judge James should have been disqualified for cause from hearing his case: (1) her previous representation of state officials in the Weinstein employment action, when the state called Weinstein as a witness in his trial; (2) her previous representation of the MacLaren School for Boys; and (3) her association with the Oregon State Police Foundation.
Defendant notes that, when Judge James was employed with the DOJ, the DOJ had connections to his murder trial. First, the DOJ represented the Mental Health Division, Oregon State Hospital, Oregon Department of Corrections, and MacLaren School for Boys, all of which had provided witnesses for the state in defendant's murder trials. Defendant contends that, during that period, Judge James had to have worked with other DOJ attorneys who appeared in matters stemming from defendant's murder cases. Second, the DOJ provided direct assistance to the Marion County District Attorney's Office in its prosecution of defendant. Defendant suggests that Judge James was among that group of attorneys, based on the appearance of her name in DOJ billing records that had been previously supplied to defendant. When defendant subsequently sought the names of DOJ attorneys who had specifically assisted in his prosecution, the DOJ responded that it was unable to locate specific documents directly responsive to defendant's request, but noted that "many attorneys" whose names were contained in the previous list also had performed services at the request of the Marion County District Attorney's Office. Finally, defendant notes that the DOJ provided representation for the state in other matters during defendant's direct appeals of his convictions.
**496 Defendant argues that, in light of those contacts that the DOJ had with his case, and without an overt screening mechanism between the DOJ's various divisions, Judge James's position as an attorney with the DOJ
*700 had to have caused her to have multiple contacts with matters related to defendant. Defendant also asserts that Judge James failed to fully reveal such contacts when she was assigned to preside over defendant's penalty-phase proceedings.
Defendant also points to Judge James's participation in a 1990 employment action brought by Weinstein, who had run the Correctional Treatment Program at the state hospital during the time in which defendant had participated in that program, against his supervisors. More than 20 years later, during defendant's latest penalty-phase trial, Weinstein testified as a witness for the state, after which Judge James advised the parties that she had a vague recollection of being involved as an attorney in a civil matter involving the witness. Following that disclosure, neither party queried Judge James further concerning her role in that case or raised an objection at that time. Defendant nevertheless later argued that James's work on the Weinstein case had created an actual conflict because the parties involved in that matter were also involved as witnesses in the criminal case against defendant or in investigations related to the wrongful-death actions that followed defendant's murders.
The Weinstein employment case arose following defendant's murder of Gray and Rockenbrant. In July 1989, after Weinstein's supervisors reassigned him and gave him different duties, Weinstein filed an employment action against those individuals. As state employees, Weinstein's supervisors were represented by Judge James in her capacity as a DOJ attorney at that time. Thus, Judge James had actively opposed Weinstein, on behalf of her clients.
In the complaint initiating his employment action, Weinstein had alleged that "the act of reassigning him to other duties was motivated by his discussions with members of the Oregon legislature and expressions of his opinions." Despite the text of Weinstein's complaint, defendant contends that Weinstein's reassignment had to have **497 directly resulted from defendant's murders, a fact, defendant implies, that in turn must have caused Judge James to have substantial contact with materials directly related to defendant while representing Weinstein's superiors. Defendant argues that Judge James improperly downplayed her connection to events in his case that were the result of her role in Weinstein's action.
With regard to Judge James's representation of the MacLaren School for Boys, defendant primarily relies on a PACER printout that was not part of the record below. The printout shows that, in a civil rights matter captioned Wentz v. Grubbs, et al. , Judge James appeared once to file an affidavit in support of a stipulated motion for an extension of time. Defendant apparently now seeks to link that contact between Judge James and the MacLaren School for Boys to the records from defendant's tenure as a MacLaren inmate admitted in evidence at defendant's penalty phase proceeding. Defendant contends that Judge James had been obliged to reveal her MacLaren connection.
Finally, defendant argues that Judge James's association with the State Police Foundation as a board member is relevant to recusal and should have been revealed below. Defendant notes that the state police (1) constituted the lead investigating agency in defendant's cases and (2) assisted the Marion County District Attorney's Office in its prosecution of defendant.
Based on Judge James's roles set out above, defendant now contends that it was error not to remove Judge James from his case (or for her not to recuse herself) under ORS 14.210(1) and Codes of Judicial Conduct. Specifically, defendant relies on ORS 14.210(1)(a) and (d), which, respectively, expressly prohibit judges from acting in matters where the judge "is a party to or directly interested in the action, suit or proceeding" or "has been attorney in the action, suit or proceeding for any party." Defendant also relies on disqualification provisions from earlier versions of the Oregon Code of Judicial Conduct and of the American Bar Association Model Code of Judicial Conduct in effect when Judge James was first assigned to preside over his penalty-phase trial.
**498 1. ORS 14.210(1)(a) and (d)
We review the ruling on defendant's motion to disqualify Judge James based on ORS 14.210(1) for legal error. See *701 State ex rel. Kafoury v. Jones , 315 Or. 201, 205-06, 843 P.2d 932 (1992) (analyzing statutes governing change of judge to determine whether trial court correctly identified legal issue). On review, defendant does not appear to argue based on the record that Judge James was either a party or else had a direct interest in his case. See ORS 14.210 (1)(a) (a judge who was "a party to or directly interested in the action, suit or proceeding" cannot serve in the matter). Instead, defendant focuses his argument on ORS 14.210 (1)(d), which provides that a judge "shall not act as judge if the judge has been attorney in the action, suit or proceeding for any party." Defendant contends that, as a former attorney for the DOJ, Judge James was disqualified from serving as the trial judge, given her alleged connections to the prosecution of this case and the Rockenbrant case.
Yet in this case, there is no dispute that Judge James was not an attorney of record in the appeals that defendant had pursued and that the DOJ had opposed on behalf of the state. And, when Presiding Judge Rhoades denied defendant's motion seeking reconsideration of his motions to remove Judge James as the trial judge in March 2014, she did not find that Judge James had acted as an attorney in defendant's criminal cases. Rather, Judge James explained that she had had no connections with the prosecution in defendant's cases, and Judge Rhoades found that "Judge James did not have any association with and was not involved in any division or units or with any attorneys who were involved in this case while she was employed as an assistant attorney general at the Oregon Department of Justice." In arguing to the contrary, defendant arranges and then connects disparate points to hypothesize that Judge James's status as a former DOJ employment attorney for the Oregon State Hospital and its supervisors (in Weinstein's case) and for the MacLaren School for Boys (in a motion for extension of time)-and later as a State Police Foundation Board member-inexorably led to contact with parts of defendant's aggravated murder case. The difficulty with that proposition, however, is that the objective evidence **499 fails to support defendant's inference that she participated as an attorney in some way in the prosecution of his criminal cases.
As noted earlier, ORS 14.210(1)(a) and (d) require judicial disqualification if a judge was "a party to or directly interested in" or "has been an attorney in" the action or proceeding. We conclude that the record supports Presiding Judge Rhoades's finding and that defendant's arguments based on ORS 14.210(1)(a) and (d) are simply unsupported by the evidence. Nothing in the record shows that, during Judge James's previous employment with the DOJ, she acted as an attorney in defendant's prosecution or the appeals that followed, nor is there any evidence that she otherwise possessed a direct interest in defendant's cases.
2. Code of Judicial Conduct
In arguing that the presiding judge should remove Judge James from his case in 2014, defendant relied for the first time on provisions of the Oregon Code of Judicial Conduct and the ABA Model Code of Judicial Code, citing versions in effect when Judge James was assigned as the trial judge. Specifically, he relied on former JR 2-106(A)(1) and (2) (2012) of the Oregon Code, which provided:
"(A) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality reasonably may be questioned, including but not limited to instances when
"(1) the judge has a bias or prejudice concerning a party or has personal knowledge of disputed evidentiary facts concerning the proceeding;
"(2) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously was associated served during the association as a lawyer in the matter, or the judge or the lawyer has been a material witness in the matter[.]"
Defendant also cited ABA Model Code, Rule 2.11(A)(6)(a) (2011), which, as set out by defendant, similarly provided:
"(A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might **500 reasonably be questioned, including but not limited to the following circumstances:
"* * * * *
*702 "(6) The judge:
"(a) served as a lawyer in the matter in controversy, or was associated with a lawyer who participated substantially as a lawyer in the matter during such association[.]"
On review, defendant contends that those code provisions and the facts establish that Judge James was disqualified from serving as the trial judge and should have disqualified herself because her impartiality could reasonably be questioned. Before addressing the substance of defendant's arguments, we note that, when defendant sought removal of Judge James in 2014 based on the Oregon Code of Judicial Conduct, JR 2-106(A)(1) had been superseded by a new version of the code that went into effect in December 2013. The new version of the rule was Rule 3.10(A)(5). That rule broadly requires-like its predecessor-that judges disqualify themselves in any proceeding in which the judge has previously served as a lawyer in the matter they are presiding over. But, with regard to a judge's previous association with other lawyers involved in the matter, the new rule significantly clarifies the permissible metes and bounds of the judge's involvement as a governmental lawyer:
"A judge shall disqualify himself or herself in any proceeding in which a reasonable person would question the judge's impartiality, including but not limited to the following circumstances:
"* * * * *
"(5) The judge:
"(a) Served as a lawyer in the matter in controversy, or, unless paragraph (5)(b) applies , was associated with a lawyer who participated substantially as a lawyer in the matter during such association;
"(b) Served in governmental employment and, in such capacity, participated personally either as a lawyer or as a supervising lawyer in the matter in controversy, or participated personally as a public official concerning the matter, **501 or has publicly expressed in such capacity an opinion concerning the merits of the matter[.]"
Rule 3.10(A)(5) (emphasis added). We need not decide which version of the code applies, however, because the result we reach is the same under either version.
Turning to the merits of defendant's code-based arguments, we consider first whether Judge James was actually biased and was required to recuse herself because she had personal knowledge of disputed facts in defendant's case, JR 2-106(A)(1), or had previously served as lawyer in that matter, JR 2-106(A)(2). We have long viewed the judiciary's duty to cultivate and maintain an image of propriety as a boundary that must not be violated if the public is to have continued confidence in the workings of our courts:
"The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. A democratic society that, like ours, leaves many of its final decisions, both constitutional and otherwise, to its judiciary is totally dependent on the scrupulous integrity of that judiciary."
In re Fadeley , 310 Or. 548, 563, 802 P.2d 31 (1990) (emphasis added). In Fadeley , for example, this court concluded that the appearance of honesty in a judicial election had been compromised after a candidate personally solicited monetary contributions for his campaign in violation of the Code of Judicial Conduct in effect at the time. The court's conclusion, however, was in part driven by the certainty with which the act itself gave rise to the appearance of impropriety:
"There is, in the context of in-person solicitation of campaign funds, a certainty of an appearance of impropriety and a high degree of likelihood of overreaching or undue influence by the requesting judge. The state has a fundamental interest in avoiding those consequences, an interest that it has vindicated by promulgating Canon 7 B(7) [expressly providing that judges may not 'personally solicit campaign contributions']."
Id . at 568, 802 P.2d 31 (emphasis added).
Here, however, that degree of certainty is missing from the factual underpinnings of defendant's arguments regarding disqualification for cause. Like the rule of judicial **502 conduct at issue in Fadeley , JR 2-106(A) and Rule 3.10(A) proscribe judicial involvement by reference to concrete, well-defined situations that, on an objective level, would clearly appear improper if they arose, whether *703 actual bias was present or not. As with defendant's statutory disqualification argument, we note that Presiding Judge Rhoades found that Judge James lacked "any association with and was not involved in any division or units or with any attorneys who were involved in this case while she was employed as an assistant attorney general at the Oregon Department of Justice." There is again an absence of any evidence that Judge James had personal knowledge of the facts in this case or that she acted as an attorney in any of defendant's criminal cases.
We next consider defendant's contention that Judge James was disqualified from serving as the trial judge based on an appearance of bias by virtue of her association with the DOJ lawyers who represented the state in defendant's criminal appeals. See JR 2-106(A)(2) (2012) ("a lawyer with whom the judge previously was associated served during the association as a lawyer in the matter"); Rule 3.10(A)(5)(a) ("unless paragraph (5)(b) applies, was associated with a lawyer who participated substantially as a lawyer in the matter"). We conclude that the association provision was not applied as broadly to former government lawyers in 2012 as defendant contends and that the new rule in effect in March 2014 clarified that aspect of the rule.
As the text of Rule 3.10(A)(5) now makes clear, the associational prohibition is subject to an exception for government lawyers. Although judges who were previously non-governmental attorneys can, indeed, be required in certain circumstances to disqualify themselves from cases based solely on employment-related associations that they held before assuming the bench, judges previously employed as government attorneys can be required to do so only if the judges had, in their prior capacities, personally participated as lawyers, supervising attorneys, or public officials in the cases that they are assigned to hear or if they had, while in those positions, publicly expressed their opinions concerning the merits of those matters. Although those tenets were first expressed as Rule 3.10(A)(5) in December 2013, the notion **503 that government-lawyers-turned-judges are not generally viewed as having had prior associations with other governmental lawyers within the same agency is not a new one. In the 1990 commentary to the ABA Model Code of Judicial Conduct, Canon 3(E)(1)(b) (in part addressing judicial disqualification based on previous associations in the practice of law), the ABA observed that "a lawyer in a government agency does not ordinarily have an association with other lawyers employed by that agency[.]"
Now, as then, that observation remains instructive. For purposes of defendant's argument that Presiding Judge Rhoades should have determined that Judge James was disqualified (or that Judge James should have recused herself) in light of the Code of Judicial Conduct, we decline to view every former government lawyer employed by the DOJ who now sits on the bench as having had a constructive association with every other DOJ lawyer based solely on the fact of their common employment with the DOJ. Here, that means that, even under the associational provision in the 2012 version of the code, for defendant to have prevailed on his motion seeking Judge James's disqualification, defendant had to establish that Judge James personally had participated as a lawyer in some aspect of defendant's criminal cases. As already noted in our discussion above, however, defendant has failed to do so. As a result, we hold that defendant's arguments for disqualification based on the Code of Judicial Conduct, either under the rule in the older version of the Code or in the current version, are not well-taken.[5]
D. Constitutional Arguments for Disqualification
Having rejected defendant's statutory and code-based arguments regarding judicial *704 disqualification, we now address the arguments that he raises under the state and federal constitutions. Defendant relies on **504 Article I, Section 11, of the Oregon Constitution, which provides, in part: "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury[.]" See State ex rel Ricco v. Biggs , 198 Or. 413, 428, 255 P.2d 1055 (1953) (noting that right to "public trial by an impartial jury" expressly guaranteed by Article I, section 11, includes right to fair and impartial trial); State v. Leland , 190 Or. 598, 608, 227 P.2d 785 (1951) (observing that a "fair trial" means, in part, trial before an impartial judge). Defendant also relies on the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." See, e.g., Johnson v. Mississippi , 403 U.S. 212, 216, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971) (noting that "[t]rial before an 'unbiased judge' is essential to due process").
According to defendant, the rights inherent in those constitutional provisions inure to criminal defendants through the protective disqualification provisions of ORS 14.210, and, by failing to adhere to its requirements, Judge James and Presiding Judge Rhoades violated his constitutional rights. Defendant relies on the same evidence and hypotheses described earlier in the context of his statutory and code-based arguments. As this opinion has already recognized, however, the record supports Presiding Judge Rhoades's finding below that "Judge James did not have any association with and was not involved in any division or units or with any attorneys who were involved in this case while she was employed as an assistant attorney general at the Oregon Department of Justice." That finding undermines defendant's contrary argument that the record reflects evidence of actual bias corresponding with the proscriptions set out at ORS 14.210 and renders his constitutional arguments as unavailing as his statutory arguments.
In addition to his contention that Judge James was actually biased, defendant also relies on judicial disqualification by virtue of an appearance of bias, such that disqualification of Judge James was required as a matter of law under Article I, section 11. This court has yet to analyze the concept of apparent bias through the lens of the Oregon Constitution, and defendant does not offer any independent standard for evaluating whether the circumstances present **505 an appearance of bias that would violate a criminal defendant's right to trial by "an impartial jury." To the extent that defendant relies on the standard set out in JR 2-106(A) (2012) or Rule 3.10(A) of the Oregon Code of Judicial Conduct-"a reasonable person would question the judge's impartiality"-for the reasons already discussed, we reject defendant's Article I, section 11, argument.
As for defendant's Due Process Clause argument, in Caperton v. A.T. Massey Coal Co., Inc. , 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), the United States Supreme Court has examined when the appearance of bias on the part of the judge becomes so significant that a party is deprived of due process. In Caperton , the Supreme Court discussed a series of circumstances not generally present at common law in which the appearance of bias objectively required judicial recusal on due process grounds. The Court broadly described those circumstances as ones "in which experience teaches that the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable." 556 U.S. at 877, 129 S.Ct. 2252 (quoting Withrow v. Larkin , 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975) ).
First, the Court highlighted cases in which a judge's financial interest in the outcome of a matter, although less than what would have been considered personal and direct at common law, nevertheless required recusal based on the perception that those interests might tempt the judge to skew the outcome of a case for one party or the other. Id . at 876-79, 129 S.Ct. 2252, citing Tumey v. Ohio , 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (where town mayor presided over certain bench trials in "mayor's court" and received salary supplement for doing so that was derived directly from court costs assessed upon conviction, due process required mayor's recusal from such proceedings); Ward v. Village of Monroeville , 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (where town mayor *705 presided over municipal traffic cases and resulting fines upon conviction constituted major revenue stream for town, due process required mayor's recusal from such proceedings); and Aetna Life Insurance Co. v. Lavoie , 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (in case involving bad faith refusal to pay insurance claim, where state supreme court justice cast deciding vote to uphold punitive damage award against **506 defendant insurance company, while at the same time serving as lead plaintiff in nearly identical lawsuit pending against different insurance company, due process required justice's recusal).
Next, the Court discussed the narrow range of so-called one-person grand jury cases, matters in which the appearance of a conflict of interest had required judicial recusal because a judge-after encountering misconduct in the courtroom, usually involving perjury or contempt-went on to criminally charge the perpetrator and then preside over his or her trial. Id . at 880-81, 106 S.Ct. 1580, citing In re Murchison , 349 U.S. 133, 138, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (where judge sitting as a one-person secret grand jury charged two witnesses with contempt, due process required judge to recuse himself from the defendants' subsequent bench trial on those charges, because "it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury secret session' "); Mayberry v. Pennsylvania , 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971) (where judge hearing criminal matter was repeatedly insulted and demeaned by pro se defendant during course of trial, due process required judge to recuse himself from presiding over defendant's subsequent contempt proceedings, because defendant's personal attacks against judge made it unlikely that judge could maintain the "calm detachment necessary for fair adjudication" of defendant's contempt charges).
Finally, the Court discussed the unique circumstances requiring recusal that had emerged from Caperton itself. Caperton had begun as a contract dispute in which a West Virginia circuit court had entered a $50 million judgment against the defendant in the action, the A.T. Massey Coal Co., Inc. (Massey). Before appealing that judgment to the West Virginia Supreme Court, Massey's CEO contributed or made expenditures totaling approximately $3 million to help the electoral campaign of an attorney running to unseat one of the court's then-incumbent justices. The attorney won his election and, as a newly minted justice slated to hear Massey's appeal, denied the opposing party's motion seeking the new justice's recusal-a motion based on the perception of conflict created by Massey's sizable financial assistance to the new justice's judicial campaign. The **507 new justice was later part of the three-person West Virginia Supreme Court majority that reversed the adverse judgment against Massey.
After granting certiorari, the United States Supreme Court overturned that decision. The Court held that, because Massey had appeared on appeal before the justice whom Massey's CEO had helped to elect to West Virginia's high court through significant campaign contributions and expenditures-which were made at a time when it was foreseeable that Massey would seek review before that tribunal-recusal had been required as a matter of due process. The rule articulated by the Court was straightforward:
"[T]here is a serious risk of actual bias-based on objective and reasonable perceptions-when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent."
Caperton , 556 U.S. at 884, 129 S.Ct. 2252. Just as no individual should be allowed to judge their own case given the inherent risk of bias in doing so, the Court observed that similar concerns can arise "when-without the consent of the other parties-a man chooses the judge in his own cause." Id . at 886, 129 S.Ct. 2252. Based on that principle, the Court concluded, the circumstances in Caperton had created a serious, objective risk of actual bias that required the new justice's recusal. Id .
The situations discussed in Caperton , in which "the probability of actual bias on the part of the judge or decision maker is too high to be constitutionally tolerable,"
*706 556 U.S. at 877, 129 S.Ct. 2252, constitute the circumstances that currently define the boundaries within which judicial recusal-based solely on an appearance of bias-is required for due process purposes. Here, however, there is nothing in the facts contained in the record that can be construed as even remotely analogous to the circumstances and factors described in Caperton . There is, for example, no evidence that Judge James possessed even an incidental or indirect financial interest in hearing defendant's case; or that she had served as both grand jury and adjudicator in the proceedings below; or that a party with a personal stake in the outcome of defendant's case **508 had had a significant and disproportionate impact on Judge James's election to the bench.
There is, in short, nothing here approaching a reasonable and objective perception from which one could or should extrapolate a constitutionally intolerable risk of judicial bias in this matter. We therefore reject defendant's due process argument and the general proposition advanced by defendant that Judge James was required as a matter of law to have been recused for cause below.
III. ASSIGNMENTS OF ERROR REGARDING EVIDENCE OF DEFENDANT'S FUTURE DANGEROUSNESS
In Oregon cases involving the death penalty, ORS 163.150(1)(b) requires, at the close of the penalty phase, that the trial court submit the following four issues to the jury for its consideration:
"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;
"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and
"(D) Whether the defendant should receive a death sentence."
Those issues are known colloquially as "the four questions." The state is obliged to prove an affirmative case regarding the first three of those statutory inquiries beyond a reasonable doubt. There is no burden of proof attached to the fourth question. ORS 163.150(1)(d).
The next group of assignments of error that we address concerns the second question set out above. As part of its case addressing the second question-essentially a question of defendant's future dangerousness-the state advised the penalty-phase trial court and defendant that it **509 had prepared a slideshow presentation and live testimony intended to demonstrate that the prison's general population-where defendant would live out his days if not sentenced to death-was, in fact, an inherently dangerous environment, particularly when compared with incarceration on death row. The rationale for doing so, the state indicated, was to establish for the jury that the proper societal context-i.e ., prison-in which it must consider the question of defendant's future dangerousness was one in which the specter of violent criminality was always present. In that regard, the prosecutor stated:
"When the jurors are asked to determine whether the defendant poses a threat to society, obviously we have to explain what society or societies we might be talking about[;] that could simply only ever include prison for this defendant[.]"
The evidence that the state sought to present, however, was not specific to defendant. Moving to exclude that evidence, defendant argued that the absence of a specific nexus between it and his own personal future dangerousness had rendered the evidence irrelevant and prejudicial. As part of that motion, defendant did not assert that incarceration would mitigate his future dangerousness.
Defendant's motion was denied, and Oregon State Penitentiary (OSP) Assistant Superintendent Brandon Kelly began his testimony by describing Oregon's prison system, prison visiting areas and various ways that contraband passes from visitors to general population inmates, and the day-today experience in the prisons, including the hierarchy of inmate status and associated acts of violence *707 by inmates. The state's slideshow presentation-accompanied by testimony from Kelly-included a virtual tour of the OSP; exposed the jury to a wide array of knives, shanks, and other homemade weapons confiscated from general population inmates; chronicled various escapes, attempted escapes, and inmate-initiated assaults; and discussed the 12 murders that had occurred within the Oregon prison system since 1988. The state also elicited testimony from retired OSP Captain Jeffrey Forbes, who testified about everyday items within the prison that could be turned into weapons, as well as about his familiarity with inmates sentenced to **510 life imprisonment who had gone on to murder other inmates while in prison.
The testimony concerning the prison environment supplemented a plethora of other evidence presented by the state specific to defendant and his future dangerousness. That evidence included accounts of defendant's previous crimes, testimony from individuals whom he had brutalized while either still a minor or during his previous terms of incarceration, as well as statements taken from defendant's own journal, in which he described his criminal behavior as "part of my power and control."[6]
Defendant has asserted seven assignments of error that address some aspect of the penalty-phase trial court's failure to grant his motion to exclude evidence relating to prison society. Of those seven assignments of error, we address the following two:
"The sentencing-only remand trial court erred in allowing the State to admit irrelevant evidence, specifically, testimony, photos and a PowerPoint presentation regarding dangerous contraband, escapes, assaults, murders and other non-statutory generalized aggravation evidence not specific to [defendant] alleged to have occurred within the ODOC[.]" (Assignment of Error No. 26.)
"The sentencing-only remand trial court erred in failing to undertake a probative value versus prejudice analysis of the State's proffered non-statutory generalized aggravation evidence not specific to [defendant] prior to it being admitted[.]" (Assignment of Error No. 27.)
Defendant sums up his position regarding those assignments of error by broadly contending that the
"fact that the environment the State itself creates, maintains and in which it places a defendant, is volatile is not **511 indicative of that defendant's propensity to commit future acts of violence. Absent some connection with [defendant] personally and individually, the criminal behavior of others housed within the ODOC should not be able to be used to negate the mitigating value of the past 27-plus years of non-violence on the part of [defendant] while he has been housed in various locations within ODOC custody."
Defendant thus contends that the evidence portraying the prison environment as dangerous was inadmissible-either as irrelevant or as unfairly prejudicial.
As an initial matter, in accordance with State v. Sparks , 336 Or. 298, 83 P.3d 304 (2004), we conclude that the evidence was relevant. Under OEC 401, "relevant evidence" means
"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."
In terms of evidentiary admissibility, that standard represents a "low bar," State v. Davis , 351 Or. 35, 48, 261 P.3d 1197, 1205 (2011), meaning that evidence is relevant so long as it increases or decreases-even slightly-the probability that a fact will be consequential to the determination of an action. State v. Barone , 329 Or. 210, 238, 986 P.2d 5 (1999), cert. den. , 528 U.S. 1086, 120 S.Ct. 813, 145 L.Ed.2d 685 (2000).
*708 And under Oregon law, whether a fact is disputed or not is of no moment for purposes of relevancy when the evidence that is intended to establish that fact will aid decisionmakers in their determinations. In that regard, the legislative commentary to OEC 401 is instructive:
" 'The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of *** considerations [set forth in] Rule 403, rather than under any general requirement that evidence is admissible only if directed to matters in dispute. Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding. Charts, photographs, views of **512 real estate, murder weapons and many other items of evidence fall in this category. A rule limiting admissibility to evidence directed to a controversial point would invite the exclusion of this helpful evidence, or at least the raising of endless questions over its admission.' "
Laird C. Kirkpatrick, Oregon Evidence § 401.02, Art. IV, 153 (6th ed. 2013) (quoting 1981 Conference Committee to OEC 401 ) (ellipses and brackets in original; emphasis added). See also State v. Williams , 357 Or. 1, 346 P.3d 455 (2015) (in child sexual abuse case, defendant's possession of children's underwear was relevant to whether he had touched five-year-old victim for a sexual purpose despite lack of argument from defendant that any contact with victim had lacked such purpose). Indeed, even when criminal defendants offer to stipulate to facts slated to be established by the evidence offered against them, the proffered stipulation does not, by itself, scrub the evidence in question of its relevancy or admissibility. See, e.g. , Sparks , 336 Or. at 307-08, 83 P.3d 304 (citing OEC 401 legislative commentary to hold that post-mortem photographs of murder victim were relevant and admissible in capital murder prosecution despite criminal defendant's pretrial offer to stipulate to facts that the photographs tended to establish as true; availability of proffered stipulation provided alternate form of proof, but did not render photographs irrelevant).
Sparks establishes the relevancy of the future dangerousness evidence that defendant now challenges on review. In Sparks -a case involving the aggravated murder of a 12-year-old girl-defense counsel indicated at the opening of the penalty-phase proceeding that he intended to dispute the notion of the defendant's future dangerousness by showing that the defendant would not pose a danger once incarcerated within a prison population of adult males. Later, over defendant's relevance objections, as part of the state's evidence addressing the question of future dangerousness, the prosecutor highlighted the opportunities for violence within prison society by presenting photographic displays of knives, drug paraphernalia, and other contraband confiscated from inmates at the Oregon State Penitentiary, as well as testimony from a prison official recounting various violent incidents perpetrated within the prison system, both by gangs and individual inmates. Id . at 320, 83 P.3d 304.
**513 On review, the defendant asserted that the trial court had erred because the evidence in question had allowed the state to prove his future dangerousness through evidence that was probative only of the bad acts of others. This court took a contrary view, stating:
"In our view, defendant's argument is incorrect because it assumes that [the prison official's] testimony and the challenged photographs solely pertained to the potential dangerousness of other prison inmates. To the contrary, that evidence described part of the violent characteristics of the institution in which defendant would be confined in the immediate future. Evidence of that violent institutional environment can assist jurors in understanding whether defendant would face a significant risk in prison of involvement in violent acts against others and, perhaps, the use of weapons that the environment affords. Thus, the state's evidence, properly understood, does pertain to defendant, and helps the jury understand, at least to some degree, the probability that defendant will *709 commit criminal acts of violence in the future."
Id . at 324, 83 P.3d 304. This court reiterated that the "society" under consideration in the second question includes "prison society." Id. at 323, 83 P.3d 304 (citing State v. Douglas , 310 Or. 438, 450, 800 P.2d 288 (1990) ). That question, the court explained, required the jury to decide "whether defendant would be dangerous in prison society," id. at 323, 83 P.3d 304, and "jurors ordinarily will not have the personal experience or expertise to know what opportunities for violence exist in the prison setting," id. at 324, 83 P.3d 304.
In a nutshell, the holding from Sparks establishes two tenets that affect the issue of future dangerousness in capital cases. First, evidence regarding the violent characteristics of prison society directly pertains to defendants who potentially face the death penalty, insofar as that evidence demonstrates characteristics of the institution in which they will presumably live out their days. Second, that evidence is relevant to a defendant's future "threat to society," because it tends to show that a defendant's risk of violent interactions with others is significant, due to the violent nature of the prison environment itself.
Defendant, however, contends that Sparks does not control. Sparks is distinguishable, defendant argues, because **514 of its different evidentiary setting: unlike the circumstances in his case, the defendant in Sparks disputed the issue of his future dangerousness by attempting to distinguish between prison and outside societies. According to defendant, the defendant in Sparks had essentially made the state's prison-related evidence regarding future dangerousness relevant by affirmatively arguing that the circumstances of his incarceration would effectively mitigate the specter of future dangerousness.
However, the state in this case articulated a theory regarding the relevance of the evidence to its proof of prison society, as approved in Sparks , and, in assessing relevance, it does not matter that defendant had not contested the fact that the prison environment offers opportunities for inmates in the general prison population to commit acts of violence against others. Following Sparks , defendant's argument concerning irrelevance of the evidence is not well-taken.
Defendant also argues that, even if relevant, the evidence of violence in prison society was outweighed by its prejudicial impact. Under OEC 403, a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. That rule provides:
"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."
As used in OEC 403, the term "unfair prejudice" does not refer to evidence that is simply harmful to the opponent's case; indeed, all evidence presented at trial is intended to prejudice one side or the other, i.e ., to increase the likelihood that the adverse party will not prevail. State v. Lyons , 324 Or. 256, 280, 924 P.2d 802 (1996). Instead, "unfair prejudice" refers to an undue evidentiary tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one. Id . Thus, successful motions to exclude evidence under OEC 403 will encompass situations in which the trier of fact will be improperly affected by factors unrelated to the fact of consequence for which a **515 particular piece of evidence has been offered. In such cases, the party seeking exclusion of that evidence bears the burden of persuasion. State v. O'Key , 321 Or. 285, 320, 899 P.2d 663 (1995). We review a trial court's decision regarding OEC 403 for abuse of discretion. State v. Moore , 324 Or. 396, 407, 927 P.2d 1073 (1996).
According to defendant, the state's prison-environment evidence was unfairly prejudicial because jurors may have failed to make an individualized determination of defendant's future dangerousness that was based on his own prison record, opting instead to infer from the state's evidence that defendant would pose a danger simply because he was part of the so-called "prisoner class." Defendant's theory that the jury could have considered that evidence and then drawn inferences unrelated to the state's actual evidentiary aims is, without more, insufficient to conclude that the trial court abused its discretion *710 and that exclusion of that evidence as unfairly prejudicial was required as a matter of law. The difficulty for defendant lies in the close connection recognized in Sparks that links evidence about the nature of prison society to the issue of a defendant's future dangerousness raised by the second question that the jury must consider. Cf . State v. Rogers , 352 Or. 510, 546-47, 288 P.3d 544 (2012) (absent close link between evidence of consensual homosexual relationship occurring during defendant's youth and issue of defendant's future dangerousness, trial court erred in allowing evidence of that relationship to prove future dangerousness in capital case where murder victims had all been women; without requisite nexus, slight relevance of evidence under OEC 401 was outweighed by danger of unfair prejudice under OEC 403 ); State v. Flett , 234 Or. 124, 128, 380 P.2d 634 (1963) (testimony that wife accused of fatally stabbing husband had been seen at motel several months earlier with unidentified man was unduly prejudicial in the absence of "substantial connecting link" between the two occurrences).
Sparks establishes that evidence of a prison's "violent institutional environment can assist jurors in understanding whether [a] defendant would face a significant risk in prison of involvement in violent acts." Sparks , 336 Or. at 324, 83 P.3d 304 (brackets added). Defendant's blanket attempt to portray **516 all such evidence, not specific to himself, as unfairly prejudicial for purposes of determining future dangerousness is simply too broad given the strength of the evidentiary link affirmed by Sparks . Although we reject defendant's argument as framed, to be clear, our conclusion does not preclude a defendant from arguing, and a court from determining, that particular evidence related to violence in prison society-whether or not of the same types as introduced in this case-must be excluded under OEC 403 as cumulative or as unfairly prejudicial.[7] In conclusion, the trial court did not abuse its discretion by overruling defendant's objection under OEC 403 and admitting the evidence of violence in prison society.
IV. ASSIGNMENTS OF ERROR REGARDING DENIAL OF DEFENDANT'S FOURTH-QUESTION LIMITING INSTRUCTION
For capital defendants whose crimes occurred before 1995, fourth-question determinations are governed by considerations that predate the present statutory scheme set out at ORS 163.153. As a result, we begin this section with a brief primer on the evolution of the fourth question in death penalty cases, to better frame the assignments of error that defendant now raises in the context of the trial court's refusal to give the jury an instruction limiting its consideration of aggravating evidence.
A. Legal Context
The central inquiry encompassed by the fourth jury question as articulated in ORS 163.150(1)(b)(D) -whether a defendant should be sentenced to death-has been part of Oregon's death-penalty sentencing statutes since 1989, although it obtained its present text following amendments made in 1991.[8] In construing the 1989 version of the statute, **517 a majority of this court concluded that the fourth question served as a mechanism that allowed juries "to give full effect to any mitigating circumstances" that weighed against a death sentence. *711 State v. Guzek , 322 Or. 245, 263, 906 P.2d 272 (1995) ( Guzek II ). We went on to hold that such evidence was relevant-and therefore admissible-only with regard to fourth-question determinations under ORS 163.150(1)(b)(D) (1989). Id .
In 1995, the legislature amended ORS 163.150(1)(a) to provide that, in addition to evidence of mitigating circumstances, relevant aggravating evidence could also be presented to a jury as part of the fourth-question determination. See ORS 163.150(1)(a) (1995) (providing that, in sentencing proceedings for aggravated murder, "evidence may be presented as to any matter that the court deems relevant to sentence including, but not limited to, victim impact-evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family and any aggravating and mitigating evidence relevant to the [fourth question issue in ORS 163.150(1)(b)(D) ]" (emphasis added) ). Two years later, the legislature amended the statutory jury instructions that accompanied the fourth question to mirror those 1995 amendments. See ORS 163.150(1)(c)(B) (1997) (directing juries to answer the fourth question in the negative "if, after considering any aggravating evidence and any mitigating evidence concerning any aspect of the defendant's character or background ... one or more of the jurors believe that the defendant should not receive a death sentence" (emphasis added) ).
In 2004, however, this court was called upon to explore the impact of the fourth-question amendments described above on capital defendants whose crimes predated those changes. In State v. Guzek , 336 Or. 424, 433-38, 86 P.3d 1106 (2004) ( Guzek III ), this court held, in part, **518 that retroactive application of those amendments as they pertained to aggravating evidence in capital sentencing proceedings violated the ex post facto provisions of Article I, section 21, of the Oregon Constitution.[9] Since then, for individuals-like defendant-whose capital crimes occurred before the "any aggravating evidence" amendments were added to ORS 163.150, trial courts have been precluded as a matter of law from applying those particular 1995 and 1997 changes to fourth question determinations. With that legal context in mind, we turn now to the facts and to defendant's assignments or error regarding the penalty-phase trial court's fourth question-related rulings.
B. Defendant's Assignments of Error
Early in the pretrial part of his sentencing proceeding, defendant submitted Motion No. 17 to the penalty-phase trial court. He sought, in part, to preemptively exclude, on ex post facto grounds, any fourth-question aggravating evidence otherwise admissible under the 1995 and 1997 amendments.
In January 2014, Judge James granted that request, noting in the process that her
"understanding is that the State does not intend to offer any aggravating evidence with respect to issue 4, that the state is restrained in its presentation of aggravating evidence as to the first three questions, and the Court will not allow aggravating evidence with respect to the fourth question to be considered and the jury would be so instructed."
Several days later, Judge James clarified that the best way to ensure that the jury understood "what evidence is relevant to what question" would be for the parties and the court to collectively find an appropriate jury instruction:
"I think you all appreciate the need to make sure that the aggravating factors are not factors that the jury is asked to consider on the fourth question. But certainly evidence of aggravating factors is permissible in the other three questions. And so the way to address that so that a jury understands what evidence is relevant to what question is **519 one that we will work through and find an instruction that works."
Apparently, the parties did not provide a jointly requested instruction to the court. In May 2014, defendant requested that the court give the following limiting instruction to the jury:
*712 "There has been argument and evidence submitted in this case regarding the violent and criminal conduct of individuals (incarcerated and otherwise) other than that of [defendant]. You are hereby instructed not to consider evidence or argument concerning the conduct of anyone other than [defendant] in your determination of the 4th question, whether the defendant should receive a death sentence."
The court, however, refused to give defendant's proposed limiting instruction. Instead, the court gave the following instructions to the jury regarding the fourth question:
"The fourth question asked by the law is, Shall a death sentence be imposed? The burden of proof beyond a reasonable doubt does not apply to this fourth question. Regarding this question neither side bears any burden of proof. The question calls for a discretionary determination to be made by each of you based on the evidence.
"If all 12 jurors do not agree that the answer to this question is yes, then you must answer this question no. Even though you have answered yes to the first three questions, you're not required to answer yes to the fourth question. Any one of you has the power and discretion to choose life imprisonment as the appropriate sentence.
"You must answer this question no if after considering any mitigating evidence concerning any aspect of the defendant's character or background or any circumstances of the offense or any victim impact evidence relating to the personal characteristics of the victim or the impact of the crime on the victim's family, one or more of you believe that the defendant should not receive a death sentence."
The trial judge explained her reasoning for rejecting defendant's proposed jury instruction from the bench:
"I think we've captured the legal standard in Oregon adequately. And after reading the whole instruction I'm **520 also comfortable that it does direct the jury to consider mitigation evidence in a pretty explicit way without equivocation. And I don't want to introduce any equivocation into the instruction."
Defendant asserts six assignments of error on review, all of which address some aspect of the penalty-phase trial court's denial of defendant's fourth-question limiting instruction. Of those six assignments of error, we address the following three:
"Judge James erred in refusing to provide the jurors with [defendant's] requested limiting instruction[.]" (Assignment of Error No. 33.)
"Judge James erred in refusing to adhere to her pretrial assertions, rulings, and orders that she would specifically preclude the jurors' consideration of non-statutory generalized aggravation evidence not specific to [defendant] in their determination of the 4th question thereby contravening [defendant's] rights to notice and due process[.]" (Assignment of Error No. 35.)
"Judge James erred in failing to specifically preclude the jurors' consideration of non-statutory generalized aggravation evidence not specific to [defendant] in their determination of the 4th question in contravention of Article I, section 21, of the Oregon Constitution and this Court's holding in Guzek III[.]" (Assignment of Error No. 36.)
The threshold premise underlying those assignments of error is that, under the facts set out above, Judge James and the prosecution "reneged on their pretrial representations and assurances" about giving a limiting instruction concerning the fourth question. As a result, defendant argues, Judge James's failure to fulfill her promises in that regard constituted reversible error, insomuch as that failure (1) deprived defendant of notice and due process, which in turn interfered with defendant's constitutional rights to adequate and effective assistance of counsel, and (2) violated this court's ex post facto prohibition against applying aggravation evidence to the fourth question in homicide cases arising before 1995. For the latter point, defendant relies on Guzek III , 336 Or. at 430-39, 86 P.3d 1106 (holding that retroactive application of amendments to death penalty statute allowing admission of "any aggravating evidence" in penalty phase **521 of murder trial violated ex post facto prohibitions where the defendant's offenses predated 1995 and 1997 amendments; prosecution was therefore limited to presenting aggravating evidence relevant *713 to first three questions specified in statute). According to defendant, the cumulative effect of those errors now requires remand for a new trial.
C. Analysis
We turn first to the proposition that Judge James provided assurances or promises to defendant through her January 2014 statements concerning aggravating evidence and the fourth question. Generally, a trial court has broad discretion in determining whether to reconsider its earlier rulings, State v. Guzek , 358 Or. 251, 268, 363 P.3d 480 (2015), and may revisit a pretrial ruling when events at trial unfold that call for adjustments to that ruling. However, this court confronted a similar question of promissory intent in State v. Orians , 335 Or. 257, 263, 66 P.3d 468 (2003), and observed that there are
"times when a judge gives his or her word so directly that, absent unusual and unexpected subsequent developments, the judge must be said to have exercised the judge's power at the time that the judge makes the statement, even before the judge signs a document memorializing that promise."
In light of that statement in Orians , the inquiry now before us is this: Did Judge James so directly promise to provide a limiting instruction precluding juror consideration of "non-statutory generalized aggravation evidence" regarding the fourth question that it constituted an unalterable exercise of her judicial power? For the reasons that follow, we conclude that the answer to that question is "no."
In Orians -a mandamus matter involving the civil compromise provisions of ORS 135.703 to 135.709[10] -we held **522 that a judicial promise had been so directly given as to be incapable of rescission, despite the fact that it had not been entered on the case register. There, the trial court judge had made the following statement in open court regarding the proposed dismissal of theft charges against the defendant if the defendant undertook and fully executed a civil compromise with the victim:
" 'So, the good news * * * is that if you are able to pay off [the victim] in toto, then I will go ahead and dismiss this case . I'll set it over for 90 days, and that way the victim can be paid and you can be assured of a dismissal .' "
335 Or. at 260, 66 P.3d 468 (brackets and emphasis in original). The defendant subsequently executed his part of the compromise, paying the victim $3,000 and thereby changing his position in reliance on the court's statement. Id. But the trial court refused to dismiss the matter, and this court concluded that the trial court had abused its discretion and ordered the case against the defendant dismissed. Id . at 265, 66 P.3d 468. In reaching that conclusion, we were careful to note that "the judge's statement could not have been more direct." Id . at 263, 66 P.3d 468. Unambiguous and unequivocal, the statement in Orians represented, we opined, a promise that a "judge in the ordinary course must be expected to honor." Id .
In contrast here, the statements that defendant proffers as examples of an equivalent judicial promise in this case cannot be viewed as similarly unambiguous and unequivocal. The statement in Orians was marked by a promissory-like pronouncement that was susceptible to only one meaning: "you can be assured of a dismissal." By contrast, the statements at issue here contain no such promissory inclinations and are open to different interpretations. Specifically, Judge James's observation that she would not "allow aggravating evidence with respect to the fourth question to be considered and the jury would be so instructed," can be construed several ways. It might be, as defendant appears to argue, that Judge James intended to cabin the jurors' individual thought processes vis-à-vis the fourth question by instructing them on what they could not think about in the course of answering that question. Alternatively, Judge James may have meant to *714 convey that she would not allow aggravating evidence to be introduced at trial for purposes of the fourth **523 question and intended to find an appropriate jury instruction consistent with that goal.
Of those two views, the latter appears the most likely to be correct, given that Judge James's statements arose against the backdrop of a pretrial ex post facto motion to exclude evidence tendered by defendant to avoid exactly such a scenario. Our conclusion finds further support in Judge James's subsequent comments-set out above-regarding the importance of ensuring that the jury understood "what evidence is relevant to what question." Not only do those comments demonstrate that jury instructions regarding the fourth question remained a work in progress at the time ("we will work through and find an instruction that works"), they also show that the penalty-phase trial court was focused less on how the jury would process the relevant evidence presented to it and more on what relevant evidence the jury could be properly presented with (noting the "need to make sure that the aggravating factors are not factors that the jury is asked to consider on the fourth question" (emphasis added) ). In light of Orians , and the fact that (1) alternative meanings can be attributed to the statements at issue here and (2) those statements lack any overtly promissory impetus, there is insufficient evidence on this record from which we can conclude that an unequivocal promise was made below to provide the jury with defendant's requested limiting instruction.
Defendant further contends that, in any event, promise or not, the penalty-phase trial court's failure to specifically instruct jurors not to consider "non-statutory, generalized aggravation evidence" that was not specific to defendant violated the ex post facto holding in Guzek III . A proper understanding of this court's decision in Guzek III is a prerequisite to ascertaining whether an ex post facto violation did, indeed, take place below.
In Guzek III , this court vacated the defendant's death sentence and remanded for new sentencing proceedings based on the trial court's failure to instruct the jury on a true-life sentencing option. 336 Or. at 430, 86 P.3d 1106. Having done so, however, we went on to explore various issues preserved by the defendant that would likely arise on remand, among **524 them the question of whether the "any aggravating evidence" provision added as a fourth-question evidentiary consideration in 1995 should be applied at the defendant's new sentencing proceedings, despite the fact that he had committed his crimes in 1987.
In taking up that issue, this court noted, in part, that the 1995 amendment had effectively removed two evidentiary limitations that had previously favored capital sentencing defendants, namely, that all evidence supporting a sentence of death must (1) be limited in its relevance to either the first three statutory questions or as rebuttal to mitigation evidence, and (2) when applied to the first three statutory questions, implicate the highest possible burden of proof. Id . at 438, 86 P.3d 1106. Because removal of those limitations constituted a "one-sided" alteration that had made imposition of a death sentence more likely, we held that the retroactive application of such changes in a capital sentencing proceeding would violate the ex post facto provisions of the Oregon Constitution's Article I, section 21 (providing, in relevant part, that "[n]o ex-post facto law *** shall ever be passed"). Id . Specifically, we concluded that, in defendant's remanded penalty-phase proceeding, the trial court was precluded from retroactively applying the "any aggravating evidence" provisions of the 1995 and 1997 amendments to the fourth-question determination. Id .
In doing so, however, this court reiterated the relevancy principles that had previously applied to evidence supporting a death sentence:
"Any determination of the relevance of the state's aggravating evidence against [the] defendant therefore must be in relation to the first three statutory questions set out in ORS 163.150(1)(b)(A) to (C) or in relation to rebuttal of any particular mitigating evidence offered by defendant."
Id . at 438-39, 86 P.3d 1106 (brackets added). This court also clarified the scope of the trial court's duty on remand by first noting that the evidence cited by the defendant as having been improperly applied to the fourth-question *715 below might nevertheless be admissible as to the second question as evidence of future dangerousness. As a result, we continued, the trial court's duty on remand was to
**525 "determine if such evidence is relevant and, therefore, generally admissible under ORS 163.150(1)(b)(B) (or under the other statutory questions on which the state bears the burden of proof), or whether the evidence qualifies solely as 'any aggravating evidence' not relevant to the first three questions and not rebutting any particular mitigating evidence offered by defendant."
Id . at 439 n. 12, 86 P.3d 1106.
In short, for defendants whose capital crimes predated the statutory inclusion of aggravating evidence as a factor in fourth question determinations, our ex post facto holding in Guzek III reimposed several constraints on the penalty-phase process. First, it prohibited trial courts from admitting into evidence aggravating facts relevant solely to the fourth question.[11] Second, it prohibited trial courts from instructing jurors to consider such evidence in reaching the fourth-question determination.
Neither of those fact scenarios, however, is present in this case. The penalty-phase trial court did not permit aggravating facts relevant only to the fourth question to be presented to the jury, nor did the trial court instruct the jury to consider such facts as part of its fourth-question determination. Indeed, by expressly granting defendant's motion to exclude any fourth-question aggravating evidence otherwise admissible under the 1995 and 1997 amendments, the trial court took pains to ensure the opposite outcome below. As a result, the argument that failure to give defendant's requested limiting instruction regarding the fourth question constituted an ex post facto violation under the holding in Guzek III is simply incorrect.
That said, where evidence is admissible for one purpose and not another, it is generally error-albeit not necessarily prejudicial error-for a trial court to refuse a limiting instruction that would minimize the jury's use of that evidence for the inadmissible purpose. State v. Reyes , 209 Or. 595, 630, 308 P.2d 182 (1957). Among the exceptions that trump that general rule, however, are when a proffered **526 instruction (1) is not a correct statement of the law or (2) is a correct statement of the law, but is nevertheless covered by the trial court's other instructions. State v. Barnes , 329 Or. 327, 334, 986 P.2d 1160 (1999) ; see also State v. Montez , 324 Or. 343, 362, 927 P.2d 64 (1996) (refusal to give requested jury instruction not erroneous if instruction given by court "adequately addresses the subject of the requested instruction").
Here, the jury instruction ultimately given by the penalty-phase trial court directed that mitigating evidence and victim-impact evidence[12] -as opposed to aggravating evidence-were the jury's sole concerns in rendering its fourth question determination in this case. As a matter of law, we presume that the jurors followed those instructions absent an overwhelming probability that they were unable to do so. State v. Terry , 333 Or. 163, 177, 37 P.3d 157 (2001). Assuming arguendo that defendant's requested limiting instruction would have been correct as a matter of law if it had been given, we nevertheless hold that the fourth-question instruction ultimately provided in this case was adequate to the task of directing the jury in its proper consideration of the evidence. The penalty-phase trial court did not err in declining to give defendant's requested limiting instruction.
*716 V. ASSIGNMENTS OF ERROR REGARDING CHANGES TO OREGON'S CAPITAL SENTENCING STRUCTURE AFTER PENRY v. LYNAUGH
A. Background and Assignments of Error
In June 1989, approximately two years after defendant murdered Anne Gray, the United States Supreme Court decided Penry v. Lynaugh , 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). In Penry , a Texas statutory capital sentencing procedure required a trial court to submit three **527 questions to the jury. 492 U.S. at 310, 109 S.Ct. 2934. The Supreme Court held in part that, in the absence of an instruction informing the jury that it could consider and give effect to mitigating evidence by declining to impose the death penalty, the jury had not been provided with a vehicle for expressing a reasoned and moral response to such evidence in reaching its capital sentencing decision. Id. at 328, 109 S.Ct. 2934. The lack of such an instruction, the Court opined, required remand for resentencing. Id .
At the time, Oregon's death penalty instructions had been based on the same Texas statutory scheme applied in Penry . Compare Penry , 492 U.S. at 310, 109 S.Ct. 2934 (quoting Tex Code Crim. Proc. Ann. art. 37.071(b) (Vernon 1981 and Supp. 1989) ), and ORS 163.150(1) (1989). The final group of assignments of error that we discuss concerns the legislative and judicial responses to the Penry decision, which included changes to Oregon's capital sentencing statutes. We briefly describe those responses before setting out the facts and defendant's assignments of error.
In an effort to bring Oregon's statutes into line with the Supreme Court's decision in Penry , shortly after that case was decided, the Oregon Legislative Assembly added a fourth inquiry to the state's death penalty provisions in July 1989. That text provided:
"If constitutionally required, considering the extent to which the defendant's character and background and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed."
ORS 163.150(1)(b)(D) (1989). At the same time, the legislature also added the following to the death penalty statutes:
"If a reviewing court finds prejudicial error in the sentencing proceeding only, the court may set aside the sentence of death and remand the case to the trial court. No error in the sentencing proceeding shall result in reversal of the defendant's conviction for aggravated murder."
ORS 163.150(5)(a) (1989).
One month later, in August 1989, this court took up State v. Wagner , 309 Or. 5, 786 P.2d 93 (1990), cert. den. , **528 498 U.S. 879, 111 S.Ct. 212, 112 L.Ed.2d 171 (1990) ( Wagner II ). In that case, which had been remanded by the United States Supreme Court in light of its decision in Penry, see Wagner v. Oregon , 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989) (so noting), this court was called upon to consider, among other things, the constitutionality of Oregon's pre- Penry 1987 capital-sentencing statute. At that time, we adhered to our previous holding in Wagner I , concluding that ORS 163.150 was not facially unconstitutional. 309 Or. at 16, 786 P.2d 93. We also held that, in light of the changes wrought by Penry concerning the question of mitigation in death penalty cases, Oregon trial courts possessed
"the statutory authority under ORS 163.150(1), (and the constitutional responsibility if the facts require it), to submit to the sentencing jury a fourth question, in response to which the sentencing jury may spare a defendant from the death penalty[.]"
Id.
In remanding for resentencing, this court also referred to the newly amended provisions of ORS 163.150. Id . at 17, 786 P.2d 93. Ultimately, the court concluded that, in cases where a capital sentencing jury had not been instructed "to consider any mitigating aspect of defendant's life *** not necessarily related causally to the offense" in determining whether the defendant should be sentenced to death, the appropriate remedy was remand for new penalty-phase proceedings. Id . at 20, 786 P.2d 93. In reaching that conclusion, the court noted a lack of grammatical clarity in the fourth-question inquiry created *717 by the legislature, and it suggested the following as an alternative:
" 'Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death.' "
Id . at 19, 786 P.2d 93.
With that history as background, we turn now to the facts underlying defendant's assignments of error regarding the capital-sentencing processes put in place after Penry . In March 2014, defendant presented the penalty-phase trial **529 court with Defense Motion No. 41. That motion contained, in part, a standing objection regarding any application to defendant's case of the aggravated murder sentencing statutes enacted after the commission of his crimes. Among other things, defendant argued that, as applied to him, the presence of the fourth question set out at ORS 163.150 (1)(B)(d) -"Whether the defendant should receive a death sentence"-unconstitutionally subjected him to a harsher punishment than he could have otherwise received before the decision in Penry and, in any event, served as a sentence enhancer in his case that was required to be proved by the state beyond a reasonable doubt.
Although defendant's motion was denied, he nevertheless submitted a proposed jury instruction to the trial court in May 2014 that provided that the state was, as a matter of law, responsible for proving the fourth question "beyond a reasonable doubt." Like the motion that had preceded it, defendant's proposed instruction was also denied. The instruction that the trial court gave to the jury regarding the fourth question stated, in relevant part, that "the burden of proof beyond a reasonable doubt does not apply to this fourth question."
Defendant now asserts six assignments of error on review, all of which take issue in some way with the post- Penry capital sentencing process that was applied below in this case. Of those six assignments of error, we address the following three:
"The statute in effect at the time of the crimes was facially and as-applied unconstitutional, therefore, the sentencing-only remand trial court erred in applying the post- Penry I amendments to the Oregon death penalty sentencing scheme to [defendant.]" (Assignment of Error No. 53.)
"The sentencing-only remand trial court erred in denying [defendant's] proposed jury instruction requiring the State to prove an affirmative answer to the 4th question-should the defendant receive a death sentence-beyond a reasonable doubt in violation of his state and federal constitutional rights under Article I, sections 10, 11, 13, 15, 16, 20, 21, and 33, of the Oregon Constitution, and Article I, section 10, and amendments V, VI, VIII, and XIV (due process **530 and equal protection), to the United States Constitution." (Assignment of Error No. 52.)
"The sentencing-only remand trial court erred in failing to apply the requisite beyond a reasonable doubt standard to the 4th question, which, as applied to [defendant], served as a sentencing enhancer and, therefore, must be proven by the State beyond a reasonable doubt[.]" (Assignment of Error No. 54.)
B. Constitutionality of ORS 163.150 (1989)
With regard to the first of those assignments of error, number 53, defendant essentially asserts that, as a pre- Penry capital defendant in a post- Penry world, the death penalty had simply not been a constitutional option at the time of his crimes, given the absence of any provision for the consideration of mitigating evidence by the sentencing jury. Consequently, defendant argues that application of the fourth question in his case interposed a new rule that contravened ex post facto state and federal constitutional protections by subjecting him to a harsher penalty than he could have otherwise received at the time he committed his crimes. Defendant further contends that, when this court decided Wagner II , it lacked both statutory and constitutional authority to expand the then-existing three-factor capital sentencing scheme previously approved by voters in 1984. To support that proposition, defendant relies on Iselin v. United States , 270 U.S. 245, 250-51, 46 S.Ct. 248, 70 L.Ed. 566 (1926) (holding that, when statute is drawn with *718 care and its text is plain and unambiguous, courts are precluded from supplying presumably inadvertent statutory omissions because doing so "transcends the judicial function").
Defendant's arguments are both founded on the same premise, namely, that for capital crimes committed before 1989, Penry and Wagner II each imposed new conditions regarding the consideration of mitigating evidence where none had existed before, Penry at the federal level and Wagner II at the state level. In the absence of those conditions, defendant asserts, imposition of the death penalty in Oregon had not been a constitutional option when defendant committed his crimes. That premise, however, is incorrect.
**531 In Penry , the defendant had not challenged the facial validity of the Texas death statute. 492 U.S. at 315, 109 S.Ct. 2934. Instead, he challenged its application in his particular case. Specifically, the defendant in Penry argued that, because the trial court had refused to expressly instruct the jury that it could take the fact of his limited mental capacity into consideration as evidence mitigating a sentence of death, the jury had been unable to fully consider and give effect to that evidence when it was presented at trial. Id. at 320, 109 S.Ct. 2934.
In response, the Supreme Court noted that, when the defendant's conviction became final, its own precedents[13] had made clear that a State could not-consistently with the Eighth and Fourteenth Amendments-prevent a "sentencer" from considering and giving effect to evidence relevant to the defendant's background, character, or to any circumstance of the offense that mitigate against imposing the death penalty. Penry , 492 U.S. at 318, 109 S.Ct. 2934. Moreover, the Court continued, the facial validity of the Texas death penalty statute had been upheld in Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), on the basis of assurances that the special issues at play in capital cases would be interpreted broadly enough to enable sentencing juries to consider all of the relevant mitigating evidence that a defendant might present. Penry , 492 U.S. at 318, 109 S.Ct. 2934. Taking those factors into consideration, the Court concluded that the rule sought by the defendant in Penry -that, when mitigating evidence is presented as part of a capital defendant's sentencing proceedings, juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence in determining whether the death penalty should be imposed-was not a new rule. Neither did it impose any new obligation on the state. Penry , 492 U.S. at 319, 109 S.Ct. 2934.
This court tacitly reached a similar conclusion in Wagner II . Wagner II became necessary after the United **532 States Supreme Court required the court to reexamine its first decision in State v. Wagner , 305 Or. 115, 752 P.2d 1136 (1988) ( Wagner I ), judgment vacated and remanded on other grounds 492 U.S. 914, 109 S.Ct. 3235, 106 L.Ed.2d 583 (1989), in light of the Court's then-recent decision in Penry . In doing so, this court began by noting that the initial question on remand-whether the 1987 version of ORS 163.150 permitted the trial court to submit a " 'fourth question' " inquiry to the sentencing jury regarding the propriety of sentencing the defendant to death-was strictly a matter of statutory interpretation. Wagner II , 309 at 7, 786 P.2d 93.
In the analysis that followed, the court drew on two broad avenues of statutory inquiry to address the issue. As to whether ORS 163.150 (1987) allowed the introduction of all constitutionally relevant mitigation evidence for the jury's consideration, the court began by drawing on its decision in Wagner I , noting that, in that earlier decision, it had previously construed ORS 163.150 (1987) to mean that (1) capital defendants must be permitted to introduce any competent evidence relevant to mitigation on any of the three issues, Wagner II , 309 Or. at 11, 786 P.2d 93 (citing Wagner I , 305 Or. at 156-57, 752 P.2d 1136 ) and (2) juries may consider all mitigating factors or circumstances that are *719 shown by the evidence. Id . at 12, 786 P.2d 93 (citing Wagner I , 305 Or. at 160, 752 P.2d 1136 ). Indeed, this court acknowledged that, in responding to the notion expressed in Wagner I that a sentencing entity must incorporate nonstatutory mitigating circumstances into its sentencing consideration, it had expressly indicated that "the Oregon scheme is not to the contrary." Id . (citing Wagner I , 305 Or. at 161, 752 P.2d 1136 ).
This court's examination of former ORS 163.150 (1987) in Wagner II led it to conclude that the terms of that statute were consistent with the proposition that trial courts were authorized to admit the broadest range of mitigating evidence in capital sentencing cases and that capital defendants could, in turn, argue to the jury for a life sentence based on that evidence. Wagner II, 309 Or. at 11-12, 786 P.2d 93. The court noted, however, that those provisions did not facially translate into a statutory right to have a general mitigation question submitted to the jury. Accordingly, this court turned to a second statutory inquiry: Did former ORS 163.150 (1987)
**533 permit a general mitigation question to be submitted to the jury in a capital case?
In the course of addressing that second question, the court first acknowledged that (1) trial courts had a responsibility to thoroughly instruct jurors regarding the law controlling their deliberations and (2) that responsibility was mandated by long-standing statutory sources. The court noted, for example, that ORCP 58 B(6) and 59 B-rules of civil procedure otherwise made applicable to criminal proceedings by ORS 136.330 -respectively provided that "[t]he court * * * shall charge the jury" and, "[i]n charging the jury, the court shall state to them all matters of law necessary for their information in giving their verdict." Wagner II, 309 Or. at 14-15, 786 P.2d 93 (emphasis added). Moreover, the responsibility to instruct juries on "all [necessary] matters of law" was accompanied by a
" 'well-established rule in this state that a party litigant is entitled to have the court instruct the jury upon his theory of the case as formulated in properly requested instructions which correctly state the law, and which are founded upon the pleadings and the proof in the case.' "
Id . at 15, 786 P.2d 93 (quoting Denton v. Arnstein , 197 Or. 28, 46, 250 P.2d 407 (1952) (emphasis added) ).
Combining those observations with an examination of ORS 163.150 (1987) as it pertained to mitigating evidence and the direction provided by the Supreme Court in Penry , this court summarized the following points from its analysis:
"We are thus left with circumstances in which (1) the federal constitution requires admission of all mitigating evidence; (2) the statute permits admission of such evidence; (3) the federal constitution requires a mechanism for meaningful consideration of all mitigating evidence, including evidence beyond the scope of the statutory questions; (4) the statute permits arguments by defendant for life based on all mitigating evidence; (5) the trial court is obliged to instruct the sentencing jury on all necessary matters of law; and (6) defendant is entitled to an instruction that, notwithstanding an affirmative answer to the statutory questions, the jury may conclude that mitigating evidence justifies imposition of a life sentence."
**534 Wagner II, 309 Or. at 15-16, 786 P.2d 93. Under such circumstances, the court concluded, trial courts had the statutory authority under ORS 163.150(1) to submit a fourth question to sentencing juries that would allow them to spare a capital defendant from death. Id . at 16, 786 P.2d 93.
The principle that we draw from our discussion of Wagner II is this: With regard to mitigating evidence in capital sentencing proceedings held before Penry and Wagner II , Oregon law did not prohibit a capital defendant from presenting mitigating evidence to the jury or having that jury rely upon such evidence to spare the defendant's life. Thus, the proposition advanced here by defendant that those rights did not exist before Penry does not square with Wagner II and the Supreme Court's decision in Jurek . Defendant is correct that, after Penry , the legislature added a statutory fourth question and this court articulated a fourth question in Wagner II . However, the majority of this court in Wagner II had already rejected defendant's current arguments, which the *720 dissent in Wagner II had urged the court to accept. See Wagner II , 309 Or. at 24-26, 786 P.2d 93 (Linde, J., dissenting) (stating that the statute "was unconstitutional as written" and as interpreted). We therefore similarly reject defendant's argument that application of the fourth question in his case subjected him to a harsher penalty than he could have otherwise received when he committed his crimes by virtue of purported unconstitutional capital sentencing statute.
We also reject the notion that, at the time of the decision in Wagner II , this court lacked the authority to expand the three-factor capital sentencing scheme that was part of Oregon's statutes at the time. The majority opinion in Wagner II militates for a contrary conclusion, as does our decision in State v. Upton , 339 Or. 673, 125 P.3d 713 (2005).
The defendant in Upton had been charged in 2004 with multiple counts of racketeering and aggravated theft. In keeping with the United States Supreme Court's then-recent decision in Blakely v. Washington , 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the charging indictment had included, as a sentencing enhancement factor, an allegation that the defendant had been persistently involved in criminal activities, evidence of which had been set out in the **535 indictment as a list of the defendant's multiple prior convictions. The defendant, however, demurred to the indictment, arguing that aggravating factors could not be alleged in the charging instrument because there was no statutory authority at the time expressly allowing Oregon trial courts to submit such factors to a jury. The trial court did not dismiss the indictment, but it did rule that the defendant's involvement in past crimes could not be submitted to the jury. Upton, 339 Or. at 675-76, 125 P.3d 713.
In a mandamus case that followed, this court disagreed, noting that nothing in Oregon's statutes either (1) limited a jury's ability to make the necessary findings to impose an enhanced sentence or (2) prohibited implementation of the Sixth Amendment's requirement that sentencing enhancement factors be proved to a jury beyond a reasonable doubt. Id . at 679-81, 125 P.3d 713. Upton stands for the proposition that, when required by United States Supreme Court rulings on the constitutionality of a criminal trial procedure, state courts may comply with such rulings by including, if appropriate, an additional or alternative step not otherwise articulated in existing state statutes, provided that the step in question is neither precluded by, nor inconsistent with, those statutes. Upton is consistent with this court's decision in Wagner II.
C. The Fourth Question: Burden and Standard of Proof
Finally, we turn to defendant's assignments of error-numbers 52 and 54-concerning the burden and standard of proof as to the fourth question. Defendant contends that the trial court erred by (1) failing to instruct the jury that the fourth question must be proved by the state beyond a reasonable doubt and (2) failing to require the state to prove the fourth question beyond a reasonable doubt.
Defendant argues that, by making the death penalty in his case a constitutional possibility when it had not existed before, this court functionally transmogrified the fourth question into a sentencing enhancement element that must be proved beyond a reasonable doubt. Defendant contends that the trial court's failure to so instruct the jury violated the United States Supreme Court's decision in **536 Apprendi v. New Jersey , 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that, other than the fact of a prior conviction, any fact increasing a criminal penalty beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt).
This court expressly rejected defendant's Apprendi -violation argument in State v. Longo , 341 Or. 580, 148 P.3d 892 (2006), cert. den. , 552 U.S. 835, 128 S.Ct. 65, 169 L.Ed.2d 53 (2007). In that case, this court held that
" Apprendi / Blakely applies only to 'facts.' See Blakely , 542 U.S. at 301, 124 S.Ct. 2531 ('any fact that increases the penalty' (emphasis added; quoting *721 Apprendi , 530 U.S. at 490, 120 S.Ct. 2348 ) ); see also Ring [v. Arizona ], 536 U.S. [584,] 609, 122 S.Ct. 2428[, 153 L.Ed.2d 556 (2002) ] (Sixth Amendment right to trial by jury applies to 'the factfinding necessary to put [a defendant] to death'). But the fourth question does not involve any determination of fact. Instead, in answering the fourth question, the jury weighs aggravating factors against mitigating factors. '[T]he fourth question does not carry a burden of proof, "because it does not present an issue subject to proof in the traditional sense[;] rather[,] it frames a discretionary determination for the jury." ' Moore , 324 Or. at 432, 927 P.2d 1073 (emphasis and second alteration in original; quoting State v. Wagner , 309 Or. 5, 18, 786 P.2d 93, cert. den. , 498 U.S. 879, 111 S.Ct. 212, 112 L.Ed.2d 171 (1990) ). Because the fourth question does not involve a determination of fact, Apprendi / Blakely does not require the state to prove it beyond a reasonable doubt."
Id. at 605-06, 148 P.3d 892. We decline to now abandon that reasoning here.
VI. CONCLUSION
Although we do not discuss them, we have examined each of defendant's other penalty-phase assignments of error and the arguments defendant has made in support of them. As to those other assignments of error, we conclude that they are without merit. Consequently, we affirm the sentence of death.
The sentence of death is affirmed.

Rockenbrant had disappeared in April 1988 after reportedly going out to meet defendant, and his bludgeoned remains were found shortly thereafter buried behind defendant's Oregon State Hospital cottage. The shallow grave into which Rockenbrant's body had been placed was marked by a note identifying it as "Cottage 18 garden plot. Please leave alone." Defendant was returning to his cottage as hospital staff were investigating the so-called "garden plot" and fled in the automobile that had belonged to Rockenbrant after staff ordered him to stop and speak with them. Upon learning of Rockenbrant's murder, the daughter of defendant's aunt contacted police authorities concerning a suspiciously large hole that defendant had dug in her mother's backyard that previous winter.
The aggravated murder convictions for Rockenbrant's death that followed were later reversed and remanded on direct review. See State v. Langley , 314 Or. 511, 840 P.2d 691 (1992) (so holding). On remand, defendant and the state reached a deal in which defendant agreed to a stipulated facts trial-after which he was again convicted on multiple counts of aggravated murder-in exchange for a life sentence with a chance for parole after 30 years. Those convictions and that sentence are not at issue in this case.

At the time of defendant's motion, the Code of Judicial Conduct had been revised, and the analogous rule that applied was Rule 3.10(A)(5), which we later discuss.

To be precise, the temporal requirement of ORS 14.270 can vary somewhat according to a judicial district's population. ORS 14.260(4), for example, provides that, for judicial districts with a population of 200,000 or greater, the affidavit and motion for change of judge "shall be made at the time and in the manner prescribed in ORS 14.270." At the same time, ORS 14.260(5) provides that in judicial districts with a smaller population-between 100,000 and 200,000-the affidavit and motion must be made "at the time and in the manner prescribed in ORS 14.270 unless the circuit court makes local rules under ORS 3.220 [adopting the alternative procedure described in ORS 14.260(2) ]." Because the Marion County Judicial District (District 3) has a population over 200,000, ORS 14.260(5) is inapplicable here.

In his reply brief to this court, defendant also argues for the first time on appeal that he never personally received a copy of the notice assigning Judge James to his case. Defendant asserts that he has consistently contended as much throughout this matter and points to various places in the record to support that position. Having searched defendant's references to the record, however, we have been unable to find any argument to that end. Consequently, we decline to consider that argument, on the ground that it was not preserved below.

The same is true for defendant's reliance on Canon 2, Rule 2.11(A)(6) of the ABA Model Code of Judicial Conduct (2011). Although defendant's opening brief fails to set out the rule in its entirety, the rule is, with only minor exceptions, virtually identical to the text of Rule 3.10(A)(5) (2013) and subject, therefore, to the same analysis. Having examined and rejected defendant's arguments regarding judicial disqualification under the Oregon rule, it is unnecessary to repeat that process in order to also reject the notion that the ABA Model Code of Judicial Conduct similarly required Judge James's disqualification in this matter.

Specifically, defendant wrote:
"I see my criminality as part of my power and control, regulation patterns. I use calculating, compulsive thinking towards criminal, hurtful behavior. I favor my self-gratification.
"My failure to resist these impulses is evidenced by my extensive criminal history. I use my criminality as a rebellious expression of autonomy and to [sic ] damage and destruction that I cause is symbolic in nature. It is my way of saying fuck the world. I am someone. And I will do whatever I want to whenever I want to do it."

Although we focus on admissibility of evidence of violence in prison, we do not mean to imply that other evidence pertaining to a defendant's future dangerousness, although not specific to the defendant, is inadmissible. For example, in this case, defendant was able to establish through cross-examination of Forbes, and without objection, that inmates at OSP sentenced to lengthy sentences, such as life imprisonment, comprise a generally well-behaved inmate population.

ORS 163.150(1)(b)(D) (1989) provided:
"If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed."
The 1991 Legislative Assembly amended the statute to its current form in response to this court's decision in State v. Wagner , 309 Or. 5, 16, 786 P.2d 93, cert. den. , 498 U.S. 879, 111 S.Ct. 212, 112 L.Ed.2d 171 (1990), that the trial court has authority to submit to the sentencing jury a fourth question allowing the jury to spare the life of the defendant.

This court's holding in Guzek III regarding the fourth question is discussed in greater detail below.

ORS 135.703 to 135.709 authorize dismissal of criminal prosecutions pursuant to a civil compromise. Specifically, ORS 135.705(1)(a) provides:
"If the person injured acknowledges in writing, at any time before trial on an accusatory instrument for the crime, that the person has received satisfaction for the injury, the court may, in its discretion, *** enter a judgment dismissing the accusatory instrument."
Discharge by compromise is a bar to another prosecution for the same crime. ORS 135.707.

As we explain in footnote 12, the court in Guzek III also held that, regardless of the defendant's ex post facto arguments, victim impact evidence was admissible under the fourth question. 336 Or. at 440-48, 86 P.3d 1106.

Oregon voters adopted the crime victim's rights provisions set out at Article I, section 42, of the Oregon Constitution as a legislatively referred constitutional amendment in 1999, long after the commission of the crime at issue in this case. Among other things, the amendment provided that crime victims have "[t]he right * * * to be heard at * * * the sentencing * * * disposition." Or. Const., Art. I, § 42 (1)(a). In Guzek III , 336 Or. at 440-48, 86 P.3d 1106, this court held that the application of that right in capital cases that predated the amendment did not offend the ex post facto prohibitions of either the state or federal constitutions. We decline to revisit that holding in Guzek III .

See, e.g ., Eddings v. Oklahoma, 455 U.S. 104, 113-14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (applying Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), to hold that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law , any relevant mitigating evidence" (emphasis in original) ).