No. 20 January 22, 2026 513

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATTHEW ALEXANDER McADOO,
*Defendant-Appellant.*

Washington County Circuit Court
21CR29324; A180365

Erik M. Buchér, Judge.

Argued and submitted September 27, 2024.

Emily P. Seltzer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Hellman, Judge, and O'Connor, Judge.*

HELLMAN, J.

Affirmed.

------------

* O'Connor, Judge *vice* Mooney, Judge.

**HELLMAN, J.**

Defendant appeals from a judgment of conviction for second-degree murder, ORS 163.115, and unlawful use of a weapon, ORS 166.220, raising eight assignments of error. First, in three assignments of error, defendant argues that the prosecutor made improper statements that deprived him of a fair trial and thus the trial court plainly erred in permitting the prosecutor to make those statements. Second, defendant argues that the trial court erred in admitting a photograph of the victim with his family because the photograph's probative value was substantially outweighed by the danger of unfair prejudice under OEC 403. Third, defendant argues that the trial court erred in admitting evidence that defendant reported a burglary that may not have happened because that evidence was not relevant under OEC 401. Finally, in defendant's remaining assignments of error, he argues that the trial court erred in admitting an expert witness's testimony that, in defendant's view, constituted impermissible legal conclusions.

With respect to defendant's argument that the trial court plainly erred in permitting the prosecutor's statements, we conclude that those statements do not meet the standard for plain-error review. We further conclude that the trial court did not err in admitting the photograph of the victim because admission of the photograph under ORS 41.415 is not subject to OEC 403 balancing. We also reject defendant's argument that the trial court erred in admitting evidence about the burglary report because defendant opened the door to the challenged testimony. Finally, as to defendant's challenges to the expert witness testimony, we agree that that testimony constituted improper legal conclusions, and thus the trial court erred in admitting the testimony. However, we conclude that the error was harmless. Accordingly, we affirm.

## I.   FACTS AND PROCEDURAL HISTORY

We begin with a discussion of the facts and procedural history for context and discuss additional facts and the parties' arguments relevant to each assignment of error in the course of our analysis.

The managers of the apartment complex where defendant lived notified residents that on June 17 the parking lot was going to be restriped. On the morning of the 17th, defendant, who believed that he had more time to move his car, saw that his car was being towed from the parking lot. Defendant pounded on the window of the tow truck and yelled at the driver, P, saying that his car was being ruined and that P needed to put the car down. P got out and hit the window of defendant's car, and after P and defendant argued briefly, P took defendant's car off of the tow truck.

Later that morning, as defendant and his daughter were leaving for the day, defendant drove by P, who was sitting in his tow truck. Defendant stopped abruptly in front of P's truck, got out of his car, and walked towards P, saying, "What did you say to me, motherfucker?" P sprayed defendant with pepper spray. Defendant shot P three times, and P died at the scene.

The state charged defendant with second-degree murder with a firearm and unlawful use of a weapon with a firearm. Defendant asserted that he acted in self-defense and defense of others when he shot P. ORS 161.209 (in certain circumstances, "a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose"). In support of his self-defense claim, defendant testified that after P sprayed him with pepper spray and before defendant shot P, P said, "Die, faggot," and reached for a gun that was between the center console and P's leg. Police found a holstered gun in P's truck that was tucked underneath the center armrest.

To refute defendant's self-defense claim, the state argued that defendant was the initial aggressor. ORS 161.215(1)(b) (a person is not justified in using physical force upon another person if the person is the initial aggressor). Alternatively, the state argued that defendant's use of deadly force was not reasonable. ORS 161.219(3) (a person is not justified in using deadly physical force upon another person unless the person reasonably believes that the other

person is committing or attempting to commit a violent felony against the person, committing or attempting to commit a burglary, or "[u]sing or about to use unlawful deadly physical force against a person").

In support of its argument that defendant was the initial aggressor, the state offered testimony from witnesses that defendant reached for the door handle of P's truck before P pepper sprayed defendant. The state argued that that constituted an "overt act of hostility." *See State v. Phillips*, 313 Or App 1, 6, 493 P3d 548, *rev den*, 368 Or 788 (2021) ("[P]rovocation by mere words, if unaccompanied by any overt act of hostility will not cause a person to become an initial aggressor for ORS 161.215(2)." Internal quotation marks omitted.)).

In support of its argument that defendant's use of deadly force was not reasonable, the state offered evidence that, before an officer moved P out of the tow truck to try to render aid, the officer surveyed the interior of the truck to note any "potential evidence" and to be able to describe the scene to investigators, and he did not see P's gun under the armrest. Further, when police removed P's gun from the holster, "there was a sticky release of * * * tension," suggesting that it had been "sitting [in the holster] for a while." And immediately after the shooting, defendant made repeated statements that P pepper sprayed him, but he did not tell police that P had a gun until roughly four hours after the incident, at which time defendant told investigators that P had a gun and that the "other Hispanic guy took it," meaning P's co-worker. And defendant did not tell police that P threatened to kill him. Based on that evidence, the state argued that defendant's testimony that P threatened to kill him, and that P reached for a gun, was not credible and thus defendant's conduct was not justified by self-defense.

A jury found defendant guilty of both charges.

## II.  ANALYSIS

### A.  *Prosecutor's Statements*

In defendant's first, seventh, and eighth assignments of error, he argues that under *State v. Chitwood*, 370 Or 305,

518 P3d 903 (2022), the trial court plainly erred in permitting the prosecutor to make improper statements that deprived him of a fair trial. To establish plain error in the context of a prosecutor's comments to a jury, defendant must establish that (1) the comments were improper and (2) no curative instruction could have ensured a fair trial. 370 Or at 312. "Generally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's misconduct." *State v. Davis*, 345 Or 551, 583, 201 P3d 185 (2008), *cert den*, 558 US 873 (2009). Whether a defendant was denied a fair trial is "an exceedingly high bar." *Chitwood*, 370 Or at 328.

With those standards in mind, we conclude that defendant has not established plain error. Beginning with defendant's first assignment of error, he argues that the prosecutor misstated the "initial aggressor" standard during *voir dire*. The prosecutor said that "a person can lose their right to act in self-defense if they are the initial aggressor. So, they start the fight." A prospective juror asked, "even if you start the fight, if the other person is the first person to attack you physically, does that mean you still are not allowed to then protect yourself?" The prosecutor said that he would "talk about that in some examples in a little bit," and went on to talk about the concept of withdrawing, saying "you start off by saying, 'Hey. I'm going to kick your butt,' but then it's like, 'No. It was just too much to drink. I wasn't serious.' You walk away, and then they attack you."

In defendant's view, the prosecutor's statements misstated the initial aggressor standard because they suggested that a person cannot claim self-defense if he starts a fight by merely verbally provoking another person. *See Phillips*, 313 Or App at 6 ("mere words" do not make someone the initial aggressor). We conclude that, even if those statements were improper, they were not so prejudicial that the "only possible remedy was for the trial court to grant a mistrial." *State v. Smith*, 334 Or App 89, 95, 554 P3d 817 (2024), *rev den*, 374 Or 143 (2025).

We confronted a similar situation recently in *State v. Lugo*, 342 Or App 268, 576 P3d 489 (2025). In that case, the prosecutor misstated the burden of proof in *voir dire*, when he told the jury that the state did not have to prove

that the defendant committed the crime, rather, reasonable doubt was satisfied when jurors "thought[] that a person committed a crime." *Id*. at 270. However, we concluded that the trial court's correct statement of the law in its general instructions to the jury after the close of the evidence minimized the risk that the jury would misuse the incorrect statement. *Id*. at 270-71. We further concluded that an instruction that provided the jury with the correct burden of proof would have been "sufficiently curative" such that the improper statements in *voir dire* did not deprive the defendant of a fair trial. *Id*. at 271.

Like the situation in *Lugo*, the trial court here correctly instructed the jury on the initial aggressor standard in its general instructions after the close of the evidence, which minimized the risk that the jury would misuse the *voir dire* statements. Additionally, like we did in *Lugo*, we conclude that an instruction which clarified the initial aggressor standard would have been sufficiently curative, such that the misstatement in *voir dire* did not deprive defendant of a fair trial. *See State v. Buck*, 338 Or App 314, 329-31 566 P3d 682, *rev den*, 374 Or 143 (2025) (where prosecutor's rebuttal argument was improper because it misstated the law as to how the jury could view hearsay evidence, the defendant did not establish plain error because the argument was brief and curable if the defendant had objected); *Smith*, 334 Or App at 95 (concluding that a prosecutor's "single misstatement" was a "straightforward and potentially easy-to-dispel misstatement" and had the defendant objected, "the trial court could have provided an instruction to the jury to disregard the prosecutor's misstatement of the law").

Turning to defendant's seventh assignment of error, he argues that statements that the prosecutor made during rebuttal argument denied him a fair trial. In rebuttal, the prosecutor argued that defendant was upset because he was unemployed, his house had been burglarized, and his wife was working. The prosecutor said that defendant "had a rough go at life. He's not happy with the cards he was dealt in life. And he's just a pot of boiling water waiting to explode."

Defendant argues that those comments were improper because they relied on evidence outside the record,

as "no witness testified that defendant was unhappy with his life" and "defendant testified that he was happy." Defendant further argues that the statements encouraged the jury to convict defendant based on defendant's bad character.

We agree with defendant that the prosecutor's statements were improper because they relied on facts not in evidence. *See State v. Morehead*, 307 Or App 442, 449, 477 P3d 462 (2020) (explaining that it is impermissible to reference facts outside of evidence). We conclude, however, that this is not a case where the prosecutor's statements were so prejudicial that, as a practical matter, an instruction could not remedy the prejudice. *Cf. State v. Cox*, 272 Or App 390, 409-10, 359 P3d 257 (2015) (a mistrial was necessary where the prosecutor referenced "inflammatory facts not in evidence" regarding the defendant being a drug dealer and beating the complainant's mother). Rather, had defendant objected, the trial court could have ameliorated any prejudice with a curative instruction. *See State v. Putnam*, 340 Or App 61, 65-66, 569 P3d 1014, *rev den*, 374 Or 188 (2025) (prejudice arising from prosecutor's improper statement about what "sexual offenders of children will do," which was not supported by evidence in the record, could have been cured with an instruction from the trial court); *State v. Washington*, 355 Or 612, 661, 330 P3d 596, *cert den*, 574 US 1016 (2014) (presuming that the jury followed the court's instruction that attorney's statements are not evidence, where the prosecutor referenced uncharged violent conduct by the defendant).

Finally, in defendant's eighth assignment of error, he argues that the prosecutor improperly vouched against defendant's credibility, violating his right to a fair trial. In rebuttal argument, the prosecutor said "[d]efendant is a manipulator. He believes that he has gotten you all convinced, believing his story. He's got you wrapped around his finger, and that you are going to fall for his story." The prosecutor went on to say, "He's a liar. Call him out on it," and "He doesn't like to be held accountable. He needs to be held accountable for this choice."

Viewing those statements in context, we are not persuaded that they were improper. The prosecutor made the statements after pointing to evidence that called into

question defendant's testimony that he saw P reaching for a gun, defendant's varied statements about what P sprayed him with, and the fact that defendant never informed the police that P verbally threatened to kill him. Thus, the prosecutor's statements were not improper because they were "grounded in the evidence in the record." *State v. Slay*, 331 Or App 398, 403-405, 545 P3d 768, *rev den*, 372 Or 560 (2024) (explaining that pointing to inconsistencies in the evidence, "as well as to statements that d[o] not make logical sense, to argue why the factfinder should doubt defendant's credibility *** is exactly what a prosecutor is supposed to do").

In sum, defendant has not established that any of the challenged statements meet the *Chitwood* standard for plain-error review.

B.   *Photograph of P*

In defendant's second assignment of error, he argues that the trial court erred in admitting a photograph of P with his family. During trial, defendant moved to exclude the photograph, arguing that the probative value of the photograph "is far outweighed by the prejudicial effect." OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ***."). The state argued that it was seeking to admit the photograph under ORS 41.415 and that under Oregon case law, that statute does not require OEC 403 balancing. *See* ORS 41.415 ("In a prosecution for any criminal homicide, a photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."). The trial court admitted the photograph "pursuant to the case law" and "because *** the statute allows it."

On appeal, defendant renews his argument that the trial court erred in admitting the photograph of P with his family because the trial court did not conduct OEC 403 balancing and the photograph "had little, if any, probative value and was unfairly prejudicial."[1]

_____

[1] Defendant also argues that under the reasoning of our decision in *State v. Aranda*, 319 Or App 178, 190, 509 P3d 152 (2022), *rev'd*, 372 Or 363, 550 P3d 363 (2024), which held that the Due Process Clause requires balancing before admitting prior convictions under OEC 609, the Due Process Clause similarly

We review for legal error, *State v. Baughman*, 361 Or 386, 406, 393 P3d 1132 (2017), and conclude that under Oregon case law and ORS 41.415, the trial court was not required to conduct OEC 403 balancing before admitting the photograph. *See State v. Williams*, 313 Or 19, 28, 828 P2d 1006 (1992) (concluding that ORS 41.415 "directs the trial court to admit such photographs in a prosecution for a criminal homicide if the district attorney offers them to show the general appearance and condition of the victims while alive. The statute, in effect, declares the photographs to be relevant and not subject to balancing under OEC 403."). Accordingly, the trial court did not err in admitting the photograph.

C.   *Evidence that Defendant Reported a Burglary*

In defendant's third assignment of error, he argues that the trial court erred in admitting evidence that defendant reported a burglary that may not have occurred. On direct examination, defendant testified that he had a permit to carry a concealed handgun but that he prayed he would never have to use it against another person and that it would be "a very last resort." On cross-examination, the prosecutor sought to impeach defendant, asking him, "Do you remember bragging to your neighbors about how you trained with the people from the *** sheriff's office" and "about how you weren't afraid to pull your gun out if you needed to?" Defendant responded that that statement "seemed kind of outrageous and biased" and that the son of the person who made the statement "possibly broke into [defendant's] apartment."

The prosecutor questioned defendant about the burglary and elicited testimony that defendant alleged that someone climbed onto his third-floor deck, broke into his apartment, and stole cash and ammunition from his safe. Defendant objected several times on relevancy grounds. *See* OEC 401 (evidence is relevant if it has "any tendency to make

_____

requires OEC 403 balancing before admitting a photograph of the victim under ORS 41.415. But after defendant filed his brief in this case, the Supreme Court reversed that decision, *State v. Aranda*, 372 Or 363, 383, 550 P3d 363 (2024), and because defendant does not offer any additional argument in support of his contention that the Due Process Clause requires OEC 403 balancing under ORS 41.415, we do not address that argument.

the existence of any fact that is of consequence to the determination of the action more probable or less probable"); OEC 402 ("Evidence which is not relevant is not admissible."). The prosecutor argued that "[d]efendant raised this issue himself" and that he sought to impeach defendant because the testimony would indicate that the burglary accusation was false. The trial court overruled the objections, noting that defendant "did bring it up" and that the testimony was "becoming relevant." The prosecutor continued to question defendant about the burglary and about inconsistencies in defendant's report to police about the burglary.

On appeal, defendant renews his argument that the trial court erred in admitting evidence about the burglary report because that evidence was not relevant. Specifically, defendant argues that the burglary report was relevant only on a collateral matter and thus the state was not entitled to impeach defendant by offering evidence that defendant's report was a false accusation. *See State v. Gibson*, 338 Or 560, 572, 113 P3d 423, *cert den*, 546 US 1044 (2005) ("This court consistently has held that a witness may be impeached by evidence that contradicts the witness's testimony on any independently relevant fact, although the witness cannot be impeached as to merely collateral matters.").

The state argues that defendant's argument is not preserved. *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) ("Generally, an issue not preserved in the trial court will not be considered on appeal."). Alternatively, the state argues that evidence of the burglary report became relevant when defendant opened the door to it during cross-examination. *See State v. Gutierrez*, 304 Or App 431, 440, 466 P3d 75 (2020) ("[T]he general concept of opening the door applies whenever one party opens the door on a certain subject and the other party seeks to counter or impeach that evidence * * *." (Internal quotation marks omitted.)).

As an initial matter, we disagree with the state that defendant did not adequately preserve his argument. Although defendant did not make the specific argument below that he now makes on appeal—that the state was not entitled to impeach defendant on a collateral matter— as explained below, that argument necessarily turns on

whether the evidence of the burglary report was relevant. In that circumstance, defendant's argument that the evidence was not relevant "raise[d] the relevant issue," and thus defendant's argument is preserved. *State v. Stevens*, 328 Or 116, 122, 970 P2d 215 (1998) ("[F]or purposes of preserving error, it is essential to raise the relevant issue at trial, but less important to make a specific argument or identify a specific legal source with respect to the issue raised.").

Turning to the merits, we review the trial court's ruling on relevancy for legal error, *Baughman*, 361 Or at 406, and conclude that because defendant "opened the door" to the evidence of the burglary report, the state was entitled to counter or impeach with relevant evidence that otherwise would have been irrelevant. *Lawrence v. Oregon State Fair Council*, 330 Or App 405, 411 n 6, 543 P3d 724 (2024) ("[A] party opens the door when it introduces or elicits evidence of an issue at trial. Once the door is open, the other party may counter or impeach with relevant evidence of their own, even if that evidence would have been otherwise irrelevant." (Internal quotation marks omitted.)).

Thus, once defendant introduced evidence that his neighbor's statements might not be credible because defendant accused the neighbor's son of breaking into his apartment, evidence about the burglary report became relevant to both defendant's credibility and to the neighbor's credibility, and the state was entitled to introduce evidence of its own on those matters.[2] Accordingly, the trial court did not err in admitting that evidence.

D.   *Expert Witness Testimony*

Defendant's fourth, fifth, and sixth assignments of error challenge the trial court's admission of expert witness testimony on the reasonableness of P's use of pepper spray against defendant and defendant's use of deadly force against P. As explained below, we agree with defendant's argument that the trial court erred when it admitted the expert witness testimony, because that testimony

---

[2] We note that in *Gibson*, which defendant relies on for the proposition that a "witness cannot be impeached as to merely collateral matters," the defendant did not open the door to the evidence, and thus the analysis in that case is inapposite. 338 Or at 572.

consisted of impermissible legal conclusions. However, as we further explain, the error was harmless. Because defendant used deadly force against P, the core question for the jury was whether they believed defendant's position that P had reached for a gun and was about to use deadly force against him or the state's position that P never reached for a gun and that defendant was the initial aggressor and used a disproportionate level of force in response to the pepper spray. Whether P's use of pepper spray was reasonable did not affect the jury's evaluation of the evidence on the core question of which position to believe.

We summarize the relevant procedural history and the parties' arguments, the expert's testimony, and, because it is relevant to our harmless error analysis, the parties' closing arguments and the jury instructions.

1.  *Pretrial arguments*

Prior to trial, defendant moved to limit the testimony of the state's expert witness, Hillsboro Police Commander Allen, who the state intended to call to testify about the effects of pepper spray, use of firearms, and force continuum. Relying on *State v. Woodford*, 293 Or App 484, 428 P3d 971 (2018), defendant argued that it would be impermissible for Allen to testify about whether or not defendant's use of force was reasonable because that would be a legal conclusion. 293 Or App at 487 ("As a general rule, an expert witness may not testify regarding a legal conclusion."). Defendant also expressed concern that Allen would testify about "the criminality or potential criminality of the use of pepper spray" such that the testimony would be an impermissible legal conclusion. *Id*. at 485 (where defendant claimed self-defense, expert's testimony that he "'saw no elements of a crime being committed [by the victim] *** provided an impermissible legal conclusion with respect to [the victim's] conduct during the altercation").

The state responded that Allen could not "tell the jury that *** defendant's conduct was not justified or that [P's] use of force was justified," but Allen could "offer opinions as to whether *** defendant's use of force was reasonable under the circumstances [or whether P's] use of force was

reasonable." The state said that it intended to have Allen testify that "[b]ased on his review of the evidence, he would not have established probable cause to arrest P for any *** crime[]" and that "[P's] conduct was not unlawful because it was a reasonable use of force based on defendant's conduct."

The court ruled that it would "allow [Allen] to testify to what they viewed in this case and what's appropriate response and what's not appropriate response ***." The court further ruled that as long as Allen did not "say that there were no elements of a crime being committed by [P]," Allen could testify that P's conduct would not have established probable cause to arrest P and that P's use of force was reasonable.

   2.   *Allen's testimony*

During trial, Allen testified that pepper spray is low on the "force continuum"—the levels of force available to law enforcement—because it is "rather innocuous" in that it causes pain "but it's relatively short-lived"; and that pepper spray is a "non-lethal force" because it causes very few deaths and that those deaths involved people with an underlying condition such as asthma. Allen also testified extensively about firearms and "draw times"—the time it takes for an officer to perceive a threat and then draw and fire a weapon.

The state then summarized the evidence for Allen—that there was "an aggressive encounter" earlier in the morning between defendant and P; that P is 5'8", 120 pounds, and defendant is 6'1", 280 pounds; that defendant aggressively said, "What did you say to me, motherfucker?" while approaching P's tow truck; and that defendant appeared to reach for the driver's side door of the tow truck. The state asked Allen if, based on that information, it was reasonable for P to have used pepper spray upon defendant, and Allen responded that he "believe[d] that would be reasonable, yes." The state asked Allen if he would have "formed probable cause, believed more likely than not, that [P] committed any crimes at that time by using his pepper spray," and Allen replied, "No." Finally, the state said, "you're aware that, after being pepper sprayed by [P], *** defendant fired three shots at [P]," and asked whether Allen

"believe[d] that * * * defendant's use of deadly physical force was reasonable under the circumstances of being pepper sprayed." Defendant objected, and the state replied that the trial court "already addressed this in pretrial discussions." The trial court overruled the objection, and Allen responded to the question, answering, "No."

On cross-examination, defendant posed a hypothetical to Allen in which Allen is on patrol conducting a traffic stop, goes up to the window of the car, sees a "gun right next to [the driver]," and the driver "suddenly sprays you right in the face with pepper spray." Defendant reiterated that the driver's "gun's right at arm's reach," and asked Allen if he would draw his firearm in that situation, and Allen said that he would. After defendant asked Allen questions about the Hillsboro Police Department training manual's section on use of force, defendant asked about the hypothetical again—that Allen is "at a traffic stop as a patrol deputy, you get sprayed in the face, and they have a firearm right there, you're drawing your weapon." Allen answered, "[c]orrect," and testified that whether he would shoot his weapon "would be a judgment call."

### 3. *Closing arguments and jury instructions*

During closing argument, the state argued that defendant was the initial aggressor because he "yelled, * * * stormed around his car, up to [P's] driver's side door, reaching for that." The state also argued that defendant could not have reasonably believed that P was about to use unlawful deadly physical force against him, pointing to evidence that refuted defendant's claim that he saw P reach for a gun. The state also repeatedly pointed to evidence that contradicted defendant's testimony to argue that defendant was not credible.

Defendant argued in closing that defendant "thought he and [his daughter] were going to die. He for sure thought he was going to get shot * * * [a]nd he was reacting and stopping that threat." Defendant questioned the credibility of witness statements saying that he reached for the tow truck door and argued that he did not reach for the door and was not the initial aggressor. Defendant argued that he

reacted to "being sprayed, \*\*\* [and] [t]old "'die faggot'" as P is reaching for a gun. Defendant also argued that the state could not prove intent because defendant's intent was not to kill P but to "stop the threat."

On the issue of self-defense, the trial court instructed the jury

"A person is justified in using physical force on another per-son to defend himself or a third party from what he rea-sonably believes to be the use or imminent use of unlawful physical force. In defending, a person may only use that degree of force which he reasonably believes to be neces-sary. The burden of proof is on the State to prove beyond a reasonable doubt that the defense does not apply."

The trial court further instructed the jury on the limita-tions to self-defense, including:

"The defendant is not justified in using deadly physical force on another person unless he reasonably believed that the other person was using or about to use unlawful deadly physical force against the defendant or another person"

and that

"a person is not justified in using physical force on another person if he was the initial aggressor. However, the defen-dant's use of physical force may be justified even though he was the aggressor if you find that he withdrew from the encounter and effectively communicated to the other per-son an intent to withdraw from the encounter but the other person, nevertheless, continued or threatened to continue the use of unlawful physical force on the defendant.

Provocation by mere words, if unaccompanied by any overt act of hostility, will not cause a person to become an initial aggressor."

The instructions defined deadly physical force as "physical force that, under the circumstances in which it is used, is readily capable of causing death or serious physical injury."

4.  *Analysis*

On appeal, defendant renews his argument that Allen's testimony that P's use of pepper spray was rea-sonable; that P's use of pepper spray was lawful; and that

defendant's use of deadly physical force was not reasonable constituted impermissible legal conclusions. We review the admission of expert testimony for legal error. *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000). An expert witness may testify to assist the trier of fact to understand the evidence or to determine a fact issue, but "[a]s a general rule, an expert witness may not testify regarding a legal conclusion." *Woodford*, 293 Or App at 487-88; OEC 702 (recognizing that if specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, an expert witness "may testify thereto in the form of an opinion or otherwise"). The trier of fact "should determine the facts from the evidence and draw its own conclusion." *Olson v. Coats*, 78 Or App 368, 371, 717 P2d 176 (1986).

Defendant argues that Allen's testimony is materially similar to the expert's testimony in *Woodford*, where we concluded that the expert impermissibly offered legal conclusions. 293 Or App at 485. We agree. In *Woodford*, the defendant was charged with various offenses after he shot Hains twice. *Id*. The defendant argued that he acted in self-defense, claiming that he shot Hains the first time because Hains lunged at him, and he shot him the second time because Hains had picked up a two-by-four studded with exposed nails. *Id*. at 486. To refute the self-defense claim, the state elicited testimony from a chief of police who was an expert in the use of force that, after watching a videotape of the shooting, he "'saw no elements of a crime being committed'" by Hains during the altercation. *Id*. at 487.

We concluded that the trial court erred in admitting that testimony because the expert "impermissibly offered a legal opinion on whether certain statutory elements had been met under the circumstances," and that opinion "implicitly conveyed the understanding that *** it was all but legally impossible that defendant acted in self-defense, because self-defense that includes deadly physical force is a valid defense only when a person encounters and responds to certain types of unlawful behavior." *Id*. at 489-90; *see* ORS 161.219 (the use of deadly physical force may be justified only when a person reasonably believes that the other person is committing or attempting to commit a violent felony

against the person; committing or attempting to commit a burglary; or using or about to use unlawful deadly physical force against the person). In reaching that conclusion, we noted that the expert "did not provide a factual conclusion or recite factors relevant to his self-defense analysis, *** from which the jury could draw its own conclusion regarding defendant's self-defense argument." *Woodford*, 293 Or App at 489.

Similar to the defendant in *Woodford*, defendant's self-defense claim here was valid only if defendant had encountered and responded to certain types of unlawful behavior. And Allen's testimony that P's use of pepper spray was reasonable, and that Allen would not have had probable cause that P had committed any crime was substantively no different than the testimony at issue in *Woodford*. Likewise, because defendant's use of deadly physical force was justified only if he "reasonably believe[d]" that he encountered and responded to unlawful behavior, Allen's testimony that defendant's use of deadly physical force was not reasonable was materially similar to the expert testimony in *Woodford*. ORS 161.219. Thus, just as we did in *Woodford*, we conclude that Allen's testimony constituted impermissible legal conclusions rather than "a factual conclusion" or an explanation of "factors relevant to his self-defense analysis" that would help the jury understand the evidence or determine a fact in issue. *Woodford*, 293 Or App at 489; OEC 702 (expert testimony is admissible if it will "assist the trier of fact to understand the evidence or to determine a fact in issue").[3] Accordingly, the trial court erred in admitting that testimony.

5.  *Harmless error*

Although we conclude that the trial court erred, we cannot reverse on the basis of that error if it is harmless in the legal sense, that is, "[i]f there is little likelihood that the error affected the verdict." *Woodford*, 293 Or App at 490. In determining whether erroneously admitted evidence

---

[3] As we did in *Woodford*, we note that under OEC 704, "opinion testimony is 'not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" 293 Or App at 489 n 3. OEC 704, however, "does not open the door for any and all opinion testimony embracing an ultimate issue"; for example, under OEC 702, the testimony must be helpful to the trier of fact, and must be relevant under OEC 401 and 402. *Madrid v. Robinson*, 324 Or 561, 567 n 3, 931 P2d 791 (1997).

affected the verdict, "we consider the nature of the evidence in the context of the trial as a whole." *State v. McConnell*, 308 Or App 29, 36, 479 P3d 1082 (2020). Given the factual record, defendant's theory of the case, and the jury instructions, we conclude that the trial court's error in admitting Allen's testimony was harmless under our case law.

The parties did not dispute that P sprayed defendant with pepper spray and that defendant shot P. Defendant's principal argument was that he acted in self-defense because after P pepper sprayed him, P verbally threatened to kill him and he saw P reaching for a gun. Defendant argued that he was not the initial aggressor because he did not reach for the tow truck door when he approached P's truck. Defendant did not argue that his use of force was reasonable simply because P pepper sprayed him. Indeed, such an argument was foreclosed by the jury instruction, mentioned above, that defendant's use of deadly force would only be justified if defendant "reasonably believed" that the victim "was using or about to use unlawful deadly physical force" against him because the evidence at trial indicated that pepper spray did not meet the definition of "deadly physical force."[4] "As a matter of law, we presume that the jurors followed those instructions absent an overwhelming probability that they were unable to do so." *State v. Langley*, 363 Or 482, 526, 424 P3d 688 (2018), *adh'd to as modified on recons*, 365 Or 418, 446 P3d 542 (2019), *cert den*, 141 S Ct 138 (2020). Allen's impermissible legal conclusion that defendant did not act reasonably when he shot the victim after being pepper sprayed was harmless, in light of the jury instructions and the evidence.

According to the state, defendant was not entitled to claim self-defense because he was the initial aggressor or, alternatively, his use of deadly physical force was not reasonable. In support of its position, the state presented evidence that defendant had his gun drawn and reached for the tow truck door when he approached P's truck, P did not threaten defendant, and that P did not reach for a gun.

---

[4] Although there are two other circumstances in which the use of deadly physical force may be allowed, the court, without objection, instructed the jury only on the exception to the limitation to the use of deadly physical force in ORS 161.219(3).

Thus, to determine whether defendant acted in self-defense, the jury had to decide whether to believe defendant's assertion that the victim reached for a gun and threatened to kill him. Allen's testimony did not provide any information about the victim's actions and did not help the jury weigh which of the competing narratives to believe. Thus, there is little likelihood that Allen's inadmissible testimony about the reasonableness of the victim's use of pepper spray and the lack of criminal action on the victim's part affected the jury's consideration of the central factual issue in the case. Because there is little likelihood that Allen's inadmissible testimony affected the verdict, the trial court's error in admitting that testimony was harmless.

Our conclusion that the error was legally harmless should not be taken to minimize the serious concerns regarding the admission of Allen's testimony in this case. The state was permitted to introduce an expert's legal conclusion on one of the core issues for the jury to decide; that is, whether defendant's use of deadly physical force was reasonable. The state bore the burden of proof to disprove self-defense and the importance the state placed on Allen's testimony in closing arguments indicates that the state believed Allen's testimony was needed to carry that burden. Moreover, because Allen was a law enforcement officer, there is a significant risk that the jury would place special weight on his testimony about the unreasonableness of defendant's actions. In a credibility contest, there is also concern that the jury would use Allen's inadmissible testimony to negatively evaluate defendant's overall credibility. *Cf. State v. Brown*, 297 Or 404, 439, 687 P2d 751 (1984) (explaining that, when expert testimony is introduced on a subject, there can be a danger that the jury "may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence," thereby leading the jury to "abdicate its role of critical assessment"). Finally, the jury was instructed that the use of deadly physical force was justified only if defendant "reasonably believed" that the victim "was using or about to use unlawful deadly physical force" against him. Allen's testimony about the unreasonableness of defendant's response to the use of pepper spray was thus irrelevant and likely served only to confuse the already complex issues that

the jury was required to address. Though we conclude that in the legal and factual context of this case admission of the testimony was functionally harmless, that does not obviate our concern about the risks of admission of such testimony.

Affirmed.